Dan Stormer, Esq. [S.B. #101967]
Joshua J. Nuni, Esq. [S.B. #313724]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        jnuni@hadsellstormer.com

Joshua Piovia-Scott, Esq. [S.B. #222364]
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, California 94608
Telephone: (415) 685-3591
Facsimile: (626) 577-7079
Email: jps@hadsellstormer.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN PECK, COURTNEY MONO, and WHITNEY MONO, individually and as surviving heirs and successors in interest of PAUL MONO (deceased), <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF ORANGE, SHERIFF-CORONER SANDRA HUTCHENS, in her individual and official capacities, ANTHONY MONTOYA, MICHAEL JOHNSON, BRAD CARRINGTON, BRENT LIND, JOHN FREY, AARON McFATRIDGE, and DOES 1-10, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES** <br><br> 1.  42 U.S.C. § 1983 – Excessive Force <br> 2.  42 U.S.C. § 1983 – Failure to Intervene <br> 3.  42 U.S.C. § 1983 – First Amendment Retaliation <br> 4.  42 U.S.C. § 1983 – Deprivation of Rights of Plaintiffs to Familial Relationship with Decedent <br> 5.  42 U.S.C. § 1983 – *Monell* Liability <br> 6.  Violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12131) <br> 7.  Violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) <br> 8.  Wrongful Death <br> 9.  Cal. Civil Code § 52.1 – Bane Act <br> 10. Assault <br> 11. Battery <br> 12. Negligence <br> 13. Intentional Infliction of Emotional Distress <br> 14. Negligent Infliction of Emotional Distress <br><br> **DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1.      On February 6, 2018, Orange County Sheriff's Department deputies entered the quiet Laguna Woods Village gated retirement community in broad daylight and surrounded the home of Paul Mono, a sixty-five-year-old blind man, before shooting and killing him in his living room while his wife, Plaintiff Susan Peck, looked on from only a few feet away. Mr. Mono, a syndicated cartoonist whose work had been published in *The New York Times* and hundreds of other newspapers, had no criminal record and had committed no crime. He was experiencing a mental crisis at the time due to his increasing loss of vision, and this crisis was compounded after a general contractor, Dennis Metzler, repeatedly performed inadequate work on Mr. Mono and Ms. Peck's new condominium in the retirement community. When Mr. Mono expressed his anger and frustration at Mr. Metzler to their real estate agent, Jennifer Heflin, Mr. Metzler—who was listening in via an open call on Ms. Heflin's cell phone—called 9-1-1. Instead of taking the time to appropriately assess the situation, the five Defendant Deputies rushed up to Mr. Mono and Ms. Peck's condominium with guns already drawn, ignoring the presence of key witnesses like Ms. Heflin who could have explained that Mr. Mono was blind and not dangerous. After surrounding the home, pointing their guns at Mr. Mono and Ms. Peck, and shouting incomprehensible orders, the Defendant Deputies fired fourteen bullets through the windows and door of Mr. Mono and Ms. Peck's condominium, hitting Mr. Mono six times and killing him.

2.      This tragic killing resulted from Defendants' lack of planning, failure to de-escalate the situation, use of excessive force, and inadequate and misapplied training. Mr. Mono was a retiree struggling with a debilitating disability affecting his eyesight. Defendants' unjustifiable actions endangered Ms. Peck and others and robbed Ms. Peck of her husband and Plaintiffs Courtney and Whitney Mono of their father.

3.      Plaintiffs bring this action for damages against Defendants for general, compensatory, and statutory damages, costs and attorneys' fees, declaratory relief and training resulting from Defendants' unlawful and egregious conduct, as alleged herein.

Additionally, Plaintiffs seek punitive damages against the individual Defendants.

## JURISDICTION

4.    This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, for violations of Title II of the Americans With Disabilities Act, 42 U.S.C. § 12131, and the Rehabilitation Act, 29 U.S.C. § 794, and for violations of California state law.

5.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

6.    This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claim forms part of the same case or controversy arising under the United States Constitution and federal law.

## VENUE

7.    Plaintiffs' claims arose in the County of Orange, California. Venue therefore lies in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

8.    Plaintiff Susan Peck is the wife of Paul Mono and is a resident of the County of Los Angeles.

9.    Plaintiff Courtney Mono is the daughter of Paul Mono and is a resident of the County of Los Angeles.

10.    Plaintiff Whitney Mono is the daughter of Paul Mono and is a resident of the County of Los Angeles.

11.    Plaintiffs Susan Peck, Courtney Mono, and Whitney Mono bring this claim for relief in their capacities as the successors in interest to decedent Paul Mono, for whom there is no estate opened pursuant to California Code of Civil Procedure §§ 377.30 and 377.32. *See* Ex. A, Joint Declaration of Sue Peck, Courtney Mono, and Whitney Mono Pursuant to C.C.P. § 377.32.

12.    Defendant County of Orange is a public entity, duly organized and existing

under the laws of the State of California. The Orange County Sheriff's Department ("OCSD") is the law enforcement agency for the Defendant County of Orange, and the Defendant County of Orange thus is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of OCSD and its respective employees and/or agents.

13.     Defendant Sandra Hutchens was the Sheriff-Coroner of the County of County of Orange, the highest position in OCSD, from June 10, 2008, to January 9, 2019. As Sheriff, Defendant Hutchens is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all OCSD employees and/or agents. At all relevant times herein, Defendant Hutchens was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Defendant Deputies alleged herein were committed. Defendant Hutchens is being sued in her individual and official capacities.

14.     Defendant Anthony Montoya is a Deputy with the Orange County Sheriff's Department whose acts and failures to act caused or contributed to injury to and the death of Paul Mono without justification.

15.     Defendant Michael Johnson is a Deputy with the Orange County Sheriff's Department whose acts and failures to act caused or contributed to injury to and the death of Paul Mono without justification.

16.     Defendant Brad Carrington is a Deputy with the Orange County Sheriff's Department whose acts and failures to act caused or contributed to injury to and the death of Paul Mono without justification.

17.     Defendant Brent Lind is a Deputy with the Orange County Sheriff's Department whose acts and failures to act caused or contributed to injury to and the death of Paul Mono without justification.

18.     Defendant John Frey is a Deputy with the Orange County Sheriff's Department whose acts and failures to act caused or contributed to injury to and the

death of Paul Mono without justification.

19.     Defendant Aaron McFatridge is a Sergeant with the Orange County Sheriff's Department whose acts and failures to act caused or contributed to injury to and the death of Paul Mono without justification.

20.     The true names of Doe Defendants 1 through 10, inclusive, are presently unknown to Plaintiffs, who therefore sue each of these Defendants by such fictitious names. Upon ascertaining the true identities of the Doe Defendants, Plaintiffs will amend this Complaint for Damages, or seek leave to do so, by inserting the true names in lieu of the fictitious names. Plaintiffs are informed and believe, and on the basis of such information and belief allege, that Defendants Montoya, Johnson, Carrington, Lind, Frey, McFatridge, and each Doe Defendant is in some manner legally responsible for the acts, omissions, injuries and damages herein alleged.

21.     Plaintiffs are informed and believe and thereon allege that at all times relevant herein, Defendants and each of them were the agents, employees, servants, joint venturers, partners, and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

22.     Plaintiffs are informed and believe, and thereupon allege, that at all times material herein, each of the Defendants was the agent or employee of, and/or working in concert with, his/her co-Defendants and was acting within the course and scope of such agency, employment, and/or concerted activity. Plaintiffs allege that to the extent certain acts and omissions were perpetrated by certain Defendants, the remaining Defendant or Defendants confirmed and ratified said acts and omissions.

23.     Whenever and wherever reference is made in this Complaint for Damages to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

/ / /

## PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS

24.    Plaintiffs have exhausted their administrative remedies by filing governmental tort claims.

25.    On July 5, 2018, Ms. Peck filed a Claim for Money or Damages Against the County of Orange pursuant to California Govt. Code § 910 *et seq.*

26.    The County of Orange rejected the Claim on December 4, 2018.

## FACTUAL ALLEGATIONS

27.    Paul Mono was a successful artist and syndicated cartoonist who lived happily in the Marina del Rey area for most of his life.

28.    In his mid-50s, however, Mr. Mono began to suffer from retinitis pigmentosa, a progressive disease that destroys peripheral vision. Due to the ever-increasing loss of his vision from the disease, Mr. Mono struggled to continue his artistic and professional work, which was also his passion in life. As a result, he began experiencing a gradually worsening mental crisis, which culminated shortly before the Defendant Deputies shot and killed him.

29.    In or around 2017, Mr. Mono and his wife, Plaintiff Susan Peck, decided to move to Laguna Woods, California, to accommodate Mr. Mono's visual disability. The couple chose Laguna Woods because it seemed like a peaceful, safe place to retire.

30.    With the help of a local real estate agent, Jennifer Heflin, Mr. Mono and Ms. Peck settled on a condominium in the Laguna Woods Village senior living community. Mr. Mono and Ms. Peck believed that the move to a retirement community with services tailored to Mr. Mono's disability would be safer for Mr. Mono.

31.    Mr. Mono and Ms. Peck's new Laguna Woods condominium required remodeling, however. To perform the work, Ms. Heflin connected Mr. Mono and Ms. Peck with a general contractor named Dennis Metzler.

32.    Mr. Metzler originally gave Mr. Mono and Ms. Peck an estimate of $35,000 for the cost of the paint, floor, ceiling, and electrical work. In the end, Mr. Metzler charged Mr. Mono and Ms. Peck approximately $116,000, and the work still did not

include a second bathroom in the condominium, which had been planned for.

33.    In addition to going vastly overbudget, Mr. Metzler performed unsafe and unacceptable work. The week Mr. Mono and Ms. Peck moved in, Mr. Metzler installed a washing machine that flooded the condominium's new bathroom, causing Mr. Mono and Ms. Peck to have to live in a hotel for three days while it was fixed. Later, the bedroom door fell off the hinges because it was installed with 1/4-inch screws. Mr. Metzler also left the bathroom door unpainted and cracked, the atrium door unsealed, and had installed the dryer in such a shoddy manner that every time Mr. Mono and Ms. Peck closed the dryer door, the vent hose fell out of the ceiling.

34.    Having had such a frustrating experience with Mr. Metzler, Mr. Mono and Ms. Peck decided to cut their losses, sell the condominium, and move to a retirement community in Ventura, California. In order to do so, however, Mr. Mono and Ms. Peck needed paperwork and floorplans to pass on to a new contractor who could perform the remaining work necessary to put the condominium back on the market. Mr. Mono and Ms. Peck needed floor plans from Mr. Metzler, but he was unresponsive to their requests. As a result, Mr. Mono and Ms. Peck asked the real estate agent, Ms. Heflin, to intervene on their behalf several times.

35.    On February 6, 2018, Ms. Heflin arranged for Mr. Metzler to perform a small amount of work in the condominium while Mr. Mono and Ms. Peck were out so that permits could be acquired for a new contractor to be brought in. That morning, however, Mr. Mono called Ms. Heflin and told her he did not want Mr. Metzler to come into the home. Ms. Heflin then called Mr. Metzler and told him not to go into the home that day because Mr. Mono was very upset. Instead, Ms. Heflin met Mr. Metzler in the parking lot outside Mr. Mono and Ms. Peck's condominium to get floor plans from Mr. Metzler and give them to Mr. Mono and Ms. Peck. Mr. Metzler told Ms. Heflin that if Mr. Mono was upset, she shouldn't go inside. Ms. Heflin had a long-standing relationship with Mr. Mono and Ms. Peck, however, was very comfortable with them, and considered them friends. Ms. Heflin told Mr. Metzler that she wasn't afraid of Mr.

Mono and Ms. Peck and that she would simply give them the floor plans and then leave. To appease Mr. Metzler, however, she offered to turn her phone on and leave a call between them open so Mr. Metzler could listen in on her conversation with Mr. Mono and Ms. Peck.

36.     Ms. Heflin then went into Mr. Mono and Ms. Peck's home to give them the floor plans. When she handed the floor plans to Mr. Mono, he became upset because he did not believe they were the correct plans. Being given what he perceived to be the wrong floor plans, on top of Mr. Metzler's continuing failures to perform adequate work, greatly agitated Mr. Mono and exacerbated the ongoing mental crisis he was already experiencing due to the loss of his vision. While Ms. Peck and Ms. Heflin were standing out on the patio, he retrieved an antique revolver from inside the condominium and began waving it above his head while shouting about Mr. Metzler. Ms. Heflin, who knew Mr. Mono to be nonviolent, was not afraid by Mr. Mono's behavior, and simply told him, "Paul, put the gun down," in a "knock-it-off" manner. Mr. Mono then walked back into the house and came back calmly without the revolver.

37.     One week prior, during a previous visit to Mr. Mono and Ms. Peck's condominium, Mr. Mono had shown Ms. Heflin the antique revolver but had assured her that it was not loaded. He then showed Ms. Heflin a small plastic bag containing bullets that he had stored in another room. As a result, Ms. Heflin did not think the gun was loaded when Mr. Mono waived it above his head shouting about Mr. Metzler on February 6.

38.     Mr. Metzler, however, who had been listening in to Ms. Heflin's conversation with Mr. Mono and Ms. Peck via the open call on Ms. Heflin's cellphone, hung up when he heard Ms. Heflin tell Mr. Mono to "put the gun down" and, without knowing that Mr. Mono had in fact done so and was calm, called 9-1-1.

39.     Shortly after Mr. Metzler had placed his unnecessary call to 9-1-1, Ms. Heflin returned to the kitchen area of the condominium with Mr. Mono and Ms. Peck and called Mr. Metzler in an attempt to convince Mr. Mono and Ms. Peck that he had

actually given them the correct plans. When Mr. Metzler picked up her call, however, he merely said, "Get out of there," at which point Ms. Heflin hung up the phone because she did not want Mr. Mono and Ms. Peck to overhear anything from Mr. Metzler which might upset them. Ms. Heflin attempted to convince Mr. Mono and Ms. Peck one last time to let Mr. Metzler come in and do the small amount of work that needed to be done on the condominium for the permits they needed while Mr. Mono and Ms. Peck left for a short while, but Mr. Mono became upset again and refused.

40.    Ms. Heflin said goodbye to Mr. Mono and Ms. Peck normally, exchanging hugs with each of them, and told them that she would see them the next day and that she would get them the floorplans they needed.

41.    When Ms. Heflin returned to the parking lot outside of the condominium where Mr. Metzler had parked his vehicle, Mr. Metzler told her he was glad she was out of Mr. Mono and Ms. Peck's home because the police were coming. Ms. Heflin, alarmed, then asked Mr. Metzler, "Why are the cops coming?" At which point, Mr. Metzler told Ms. Heflin that he had called 9-1-1 when he heard her tell Mr. Mono to "put the gun down."

42.    A few minutes later, Defendant Deputies Carrington, Frey, Johnson, Montoya, and Lind (the "Defendant Deputies") arrived and came rushing past Ms. Heflin and Mr. Metzler, running with guns already drawn. None of the Defendant Deputies stopped to talk to Ms. Heflin or Mr. Metzler. Mr. Metzler shouted to them to let them know they were going the wrong way and to point them in the proper direction of the condominium.

43.    Ms. Heflin told Mr. Metzler that she was going to follow the Defendant Deputies, but Mr. Metzler told her she should not do so.

44.    The Defendant Deputies then surrounded Mr. Mono and Ms. Peck's home, pointing their guns at Mr. Mono through large glass windows on the north and west walls of the building. Ms. Peck saw the five men with guns pointing at her husband and toward herself and became terrified. Mr. Mono had approached the window on the north

side of his living room waving his white blind-support cane and shouting at the Defendant Deputies. The Defendant Deputies moved around the outside of the house and shouted, continuing to point their guns inside. Because the windows were double-paned, Mr. Mono and Ms. Peck couldn't hear what the Defendant Deputies were shouting.

45.    Mr. Mono slid one of the living room windows open a few inches, and asked the Defendant Deputies, "Who are you?" After the Defendant Deputies told Mr. Mono that they were with the OCSD, Mr. Mono repeatedly shouted, "What are you going to do, shoot a blind man?!" Mr. Mono was experiencing a mental crisis at this time and was in great distress. Mr. Mono also shouted profanities at the Defendant Deputies.

46.    The Defendant Deputies did not attempt to de-escalate the situation or communicate effectively with Mr. Mono. They also failed to clear the area or create a perimeter.

47.    Instead, only ten minutes after arriving at the scene, Defendants Montoya and Johnson shot their guns repeatedly through the windows and door of the condominium, firing fourteen bullets, six of which hit Mr. Mono, killing him.

48.    Multiple bullets from both Defendants Montoya and Johnson's guns went through the wall of Mr. Mono and Ms. Peck's condominium and into their neighbor's unit. Their neighbor was not home at the time, but the bullets ripped through her dining room and her living room in the vicinity of the chair in which she typically sat to watch television.

49.    Ms. Peck was standing approximately three feet behind Mr. Mono when he was shot by Defendants Montoya and Johnson. When Defendants Montoya and Johnson opened fire, Ms. Peck was almost hit by bullets herself and crouched behind the kitchen counter to take cover. From this position, she saw Mr. Mono fall to the ground and then crawled to him. She saw that Mr. Mono's eyes looked glazed over and suspected he was dead.

---

50.    The Defendant Deputies then broke through the door of Mr. Mono and Ms. Peck's home, pulled Ms. Peck away from Mr. Mono, and handcuffed her on the floor.

51.    Defendant Montoya then led Ms. Peck out to a squad car outside of the condominium. Ms. Peck asked him repeatedly, "Why did you shoot him?"

52.    At approximately 1:45 p.m., a paramedic arrived at the scene, examined Mr. Mono, and found that he had sustained several gunshot wounds to his head and upper torso.

53.    At approximately 2:02 p.m., Mr. Mono was transported by ambulance to Mission Hospital in Mission Viejo, California. The ambulance arrived at approximately 2:11 p.m. Mr. Mono was then released into the care of a trauma surgeons, who attempted to save his life, but they were unsuccessful.

54.    Mr. Mono was pronounced deceased at approximately 3:00 p.m.

55.    Mr. Mono's autopsy revealed that Defendants Montoya and Johnson shot Mr. Mono six times, which resulted in Mr. Mono sustaining eight bullet wounds, two of which were exit wounds. Defendants Montoya and Johnson shot Mr. Mono in the head, neck, chest, back, and abdomen. The autopsy report concluded that the wounds to Mr. Mono's right kidney, liver, and brain were each potentially fatal, and that the cause of Mr. Mono's death was multiple gunshot wounds.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – Excessive Force

### (All Plaintiffs, as Successors in Interest of Decedent Paul Mono,
### Against All Defendants)

56.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set herein.

57.    On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

58.    Defendants, acting under color of state law, deprived Paul Mono of rights,

privileges, and immunities secured by the Constitution and the laws of the United States, including those secured by the Fourth Amendment to the Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, subjecting him to unreasonable and excessive force, including lethal force. Officers Montoya and Johnson unreasonably and repeatedly shot Mr. Mono through the windows of his home, resulting in his death.

59.    The foregoing wrongful acts and failures to act of Defendants killed Mr. Mono. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, Mr. Mono sustained general damages, including pre-death pain and suffering, the loss of the enjoyment of life and other hedonic damages, in an amount in accordance with proof.

60.    By engaging in the foregoing wrongful acts and failures to act, Defendants acted with conscious disregard of Mr. Mono's rights. There was no need for the Defendant Deputies to shoot Mr. Mono. In approaching the residence with their weapons drawn, prepared to shoot and kill Mr. Mono and aggressively shouting orders and pointing their guns at him, the Defendant Deputies escalated a peaceful encounter and ultimately resorted to lethal force without justification. Had the Defendant Deputies spoken with Ms. Heflin, they would have learned that she did not feel threatened by Mr. Mono when she was in the residence, that Mr. Mono posed no threat due to his visual impairment, that Ms. Peck was not in any danger, and that the use of lethal force was inappropriate.

61.    In addition, the training policies of Defendant County of Orange were not adequate to train its deputies to handle the usual and recurring situations with which they must deal, including, but not limited to, identifying and interacting with visually impaired individuals, identifying and interacting with individuals experiencing a mental crisis, utilizing de-escalation techniques, interviewing key witnesses, and setting up perimeters to safely interact with suspects accused of making violent threats. Defendant Sheriff Hutchens knew that the failure to adequately train deputies to identify and

interact with visually impaired individuals, identify and interact with individuals experiencing a mental crisis, utilize de-escalation techniques, interview key witnesses, and set up perimeters to safely interact with suspects accused of making violent threats made it highly predictable that its deputies would engage in conduct that would deprive persons such as Mr. Mono of their rights. Defendant Sheriff Hutchens and Defendant County of Orange were thus deliberately indifferent to the obvious consequences of the failure to train deputies adequately. This lack of training led to Mr. Mono's senseless killing at the hands of Defendants Montoya and Johnson.

62.    Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – Failure to Intervene

### (All Plaintiffs, as Successors in Interest of Decedent Paul Mono,
### Against All Defendants)

63.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set herein.

64.    On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

65.    Defendants, acting under color of state law, deprived Paul Mono of rights, privileges, and immunities secured by the Constitution and the laws of the United States, including those secured by the Fourth Amendment to the Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, subjecting him to unreasonable and excessive force, including lethal force. Officers Montoya and Johnson unreasonably and repeatedly shot Mr. Mono through the windows of his home, resulting in his death.

66.    Plaintiffs are informed and believe and thereon allege that, at all relevant times herein mentioned, Defendants Carrington, Lind, Frey, and McFatridge were present and had a realistic and reasonable opportunity to intervene to prevent the use of excessive force by their fellow officers against Mr. Mono, but neglected to do so.

67.    The foregoing wrongful acts and failures to act of Defendants killed Mr. Mono. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, Mr. Mono sustained general damages, including pre-death pain and suffering, the loss of the enjoyment of life and other hedonic damages, in an amount in accordance with proof.

68.    By engaging in the foregoing wrongful acts and failures to act, Defendants acted with conscious disregard of Mr. Mono's rights. There was no need for the Defendant Deputies to shoot Mr. Mono. In approaching the residence with their weapons drawn, prepared to shoot and kill Mr. Mono and aggressively shouting orders, the Defendant Deputies escalated a peaceful encounter and ultimately resorted to lethal force without justification. Had the Defendant Deputies spoken with Ms. Heflin, they would have realized she did not feel threatened by Mr. Mono when she was in the residence, that Mr. Mono posed no threat due to his visual impairment, and that the use of lethal force was inappropriate.

69.    In addition, the training policies of Defendant County of Orange were not adequate to train its deputies to handle the usual and recurring situations with which they must deal, including, but not limited to, identifying and interacting with visually impaired individuals, identifying and interacting with individuals experiencing a mental crisis, utilizing de-escalation techniques, interviewing key witnesses, and setting up perimeters to safely interact with suspects accused of making violent threats. Defendant Sheriff Hutchens knew that the failure to adequately train deputies to identify and interact with visually impaired individuals, identify and interact with individuals experiencing a mental crisis, utilize de-escalation techniques, interview key witnesses, and set up perimeters to safely interact with suspects accused of making violent threats

made it highly predictable that its deputies would engage in conduct that would deprive persons such as Mr. Mono of their rights. Defendant Sheriff Hutchens and Defendant County of Orange were thus deliberately indifferent to the obvious consequences of the failure to train deputies adequately. This lack of training led to Mr. Mono's senseless killing at the hands of Defendants Montoya and Johnson. This lack of training also led Defendants Carrington, Lind, Frey, and McFatridge to fail to intervene to prevent the use of excessive force by their fellow officers against Mr. Mono.

70.     Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – First Amendment Retaliation

### (All Plaintiffs, as Successors in Interest of Decedent Paul Mono,

### Against All Defendants)

71.     Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set herein.

72.     On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

73.     Defendants, acting under color of state law, deprived Paul Mono of rights, privileges, and immunities secured by the Constitution and the laws of the United States, including those secured by the First Amendment to the Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, retaliating against him for exercising his First Amendment right to freedom of speech and expression.

74.     Mr. Mono engaged in free speech when he shouted profanities at the deputies and asked, "What are you going to do, shoot a blind man?!" Mr. Mono's

comments and questioning angered deputies and motivated them to retaliate against Mr. Mono by shooting and killing him.

75.     Mr. Mono's protected speech and conduct was a substantial or motivating factor in the Defendant Deputies' decision to retaliate. This was demonstrated by, among other things, the fact that the Deputy Defendants' actions occurred shortly following Paul Mono's protected speech and conduct.

76.     The foregoing wrongful acts and failures to act of Defendants killed Mr. Mono. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, Mr. Mono sustained general damages, including pre-death pain and suffering, the loss of the enjoyment of life and other hedonic damages, in an amount in accordance with proof.

77.     By engaging in the foregoing wrongful acts and failures to act, Defendants acted with conscious disregard of Mr. Mono's rights. There was no need for the Defendant Deputies to shoot Mr. Mono. In approaching the residence with their weapons drawn, prepared to shoot and kill Mr. Mono and aggressively shouting orders, the Defendant Deputies escalated a peaceful encounter and ultimately resorted to lethal force without justification. Had the Defendant Deputies spoken with Ms. Heflin, they would have realized she did not feel threatened by Mr. Mono when she was in the residence, that Mr. Mono posed no threat due to his visual impairment, and that the use of lethal force was inappropriate.

78.     In addition, the training policies of Defendant County of Orange were not adequate to train its deputies to handle the usual and recurring situations with which they must deal, including, but not limited to, identifying and interacting with visually impaired individuals, identifying and interacting with individuals experiencing a mental crisis, utilizing de-escalation techniques, interviewing key witnesses, and setting up perimeters to safely interact with suspects accused of making violent threats. Defendant Sheriff Hutchens knew that the failure to adequately train deputies to identify and interact with visually impaired individuals, identify and interact with individuals

experiencing a mental crisis, utilize de-escalation techniques, interview key witnesses, and set up perimeters to safely interact with suspects accused of making violent threats made it highly predictable that its deputies would engage in conduct that would deprive persons such as Mr. Mono of their rights. Defendant Sheriff Hutchens and Defendant County of Orange were thus deliberately indifferent to the obvious consequences of the failure to train deputies adequately. This lack of training led to Mr. Mono's senseless killing at the hands of Defendants Montoya and Johnson.

79.    Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Deprivation of Rights of Plaintiffs to
### Familial Relationship with Decedent

### (Plaintiffs Sue Peck, Courtney Mono, and Whitney Mono Against All Defendants)

80.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

81.    Defendants, acting under color of state law, deprived Plaintiffs of their right to a familial relationship with decedent Paul Mono without due process of law in violation of the Fourteenth Amendment by their use of unreasonable, unjustified force and violence, which shocks the conscience, evidences deliberate indifference on the part of the Defendant Deputies, demonstrates an intent to harm, and caused injuries which resulted in Mr. Mono's death.

82.    As a proximate result of the foregoing wrongful acts of Defendants, Plaintiffs sustained general damages, including grief, emotional distress, and pain and suffering and loss of comfort and society, and special damages, including loss of support, in an amount in accordance with proof.

83.    By engaging in the foregoing wrongful acts and failures to act, Defendants

acted with conscious disregard of Mr. Mono's rights. There was no need for the Defendant Deputies to shoot Mr. Mono. In approaching the residence with their weapons drawn, prepared to shoot and kill Mr. Mono and aggressively shouting orders, the Defendant Deputies escalated a peaceful encounter and ultimately resorted to lethal force without justification. Had the Defendant Deputies spoken with Ms. Heflin, they would have realized she did not feel threatened by Mr. Mono when she was in the residence, that Mr. Mono posed no threat due to his visual impairment, and that the use of lethal force was inappropriate.

84.    In addition, the training policies of Defendant County of Orange were not adequate to train its deputies to handle the usual and recurring situations with which they must deal, including, but not limited to, identifying and interacting with visually impaired individuals, identifying and interacting with individuals experiencing a mental crisis, utilizing de-escalation techniques, interviewing key witnesses, and setting up perimeters to safely interact with suspects accused of making violent threats. Defendant Sheriff Hutchens knew that the failure to adequately train deputies to identify and interact with visually impaired individuals, identify and interact with individuals experiencing a mental crisis, utilize de-escalation techniques, interview key witnesses, and set up perimeters to safely interact with suspects accused of making violent threats made it highly predictable that its deputies would engage in conduct that would deprive persons such as Mr. Mono of their rights. Defendant Sheriff Hutchens and Defendant County of Orange were thus deliberately indifferent to the obvious consequences of the failure to train deputies adequately. This lack of training led to Mr. Mono's senseless killing at the hands of Defendants Montoya and Johnson.

85.    Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

///

COMPLAINT FOR DAMAGES                    -18-

# FIFTH CAUSE OF ACTION

## 42 U.S.C. § 1983 – *Monell* Liability

### (All Plaintiffs, as Successors in Interest of Decedent Paul Mono, and Individually, Against Defendants County of Orange and Hutchens)

86.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

87.    On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

88.    Plaintiffs are informed and believe, and thereon allege that, at all times herein mentioned Defendants County of Orange and Sheriff Hutchens acted with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Paul Mono and Plaintiffs, including the right to be free from unreasonable seizures and excessive force under the Fourth and Fourteenth Amendments, the right to procedural and substantive due process, and the right not to be discriminated against. Defendants also maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among others, the policies, practices, procedures and customs described above. At all times relevant herein, Sheriff Hutchens had final policy-making authority and promulgated and maintained constitutionally deficient policies, practices, procedures and customs. At all times relevant herein, Sheriff Hutchens had final policy-making authority and promulgated and maintained constitutionally deficient policies, procedures, practices, customs and training regarding interacting with persons with mental health disabilities, or failed to enforce any constitutionally sufficient policies, procedures, practices, customs and training.

89.    As a direct and proximate result of the foregoing, Defendants senselessly killed Paul Mono, thereby causing him and Plaintiffs the injuries and damages complained of herein and subject to proof at trial.

/ / /

## SIXTH CAUSE OF ACTION

**Violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12131)**

**(All Plaintiffs, as Successors in Interest of Decedent Paul Mono,**

**Against Defendant County of Orange)**

90.     Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

91.     On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

92.     Congress enacted the Americans With Disabilities Act ("ADA") upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. §12101(a)(2).

93.     In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

94.     Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

95.     The U.S. Department of Justice implemented Title II, 28 C.F.R. § 35.160, regulations which require public entities to take appropriate steps to ensure that communications with members of the public with disabilities are as effective as communications with others.

96.     At all times relevant to this action, Defendant County of Orange was a public entity within the meaning of Title II of the ADA and provided programs, services,

1    and activities to the general public.

2        97.    The U.S. Department of Justice, Civil Rights Division, Disability Rights

3    section has published, "Commonly Asked Questions About the Americans with

4    Disabilities Act and Law Enforcement," a document in which the U.S. Department of

5    Justice provides guidelines in the interpretation of Title II of the ADA (the Guidelines).

6    In the Guidelines, the Department of Justice notes that the ADA affects virtually

7    everything that police officers and deputies do, including providing emergency medical

8    services, arresting, booking, and holding suspects, and other duties.

9        98.    At all times relevant to this action, Mr. Mono was a qualified individual in

10   that he was a citizen of the State of California and resident in the County of Orange and

11   thereby entitled and qualified to receive and participate in the programs, services, and

12   activities provided by Defendant County of Orange.

13       99.    Mr. Mono was a person with a disability within the meaning of Title II of

14   the ADA in that he suffered from retinitis pigmentosa, an illness which involves a

15   progressive loss of cells in the retina resulting in substantial and increasing limitations in

16   visual acuity.

17       100.   Through its acts and omissions described herein, Defendant County of

18   Orange violated Title II of the ADA by excluding Mr. Mono from participation in,

19   denying him the benefits of, and subjecting him to discrimination in the benefits and

20   services the County of Orange provides to the general public.

21       101.   Through the acts and omissions of Defendant County of Orange and its

22   agents and employees described herein, Defendant County of Orange subjected Mr.

23   Mono to discrimination on the basis of his disability in violation of Title II of the ADA

24   by failing to provide communication that is as effective as communication provided to

25   the general public and by failing to provide security for Mr. Mono's person that provided

26   the same benefits as that provided to the general public.

27       102.   Through the acts and omissions of Defendant County of Orange and its

28   agents and employees described herein, Defendant County of Orange denied to Mr.

COMPLAINT FOR DAMAGES                    -21-

Mono the opportunity to receive the benefits of or to participate in the programs, services, and activities they provide, including the service or activity of communication, and the service of providing security for Mr. Mono's person, particularly with regard to providing control, restraint, communication, use of force, and custodial services.

103.    Through the acts and omissions of Defendant County of Orange and its agents and employees described herein, Defendant County of Orange subjected Mr. Mono to discrimination on the basis of his disability in violation of Title II of the ADA by failing to identify Mr. Mono as visually impaired and disabled, despite prior warnings of Mr. Mono's blindness and his reliance upon a blind assistance cane, by failing to establish a perimeter to facilitate communication with Mr. Mono before the application of force, by engaging in the threat of lethal force without verbally communicating such threats to Mr. Mono, and by fatally shooting Mr. Mono without regard to the objective lack of threat presented by Mr. Mono.

104.    Plaintiffs are informed, believe, and thereon allege that Defendant County of Orange and its agents and employees have failed and continue to fail to take into account and provide reasonable accommodations for persons with visual disabilities by failing to:

    a. Adopt and enforce policies and procedures for communicating effectively, controlling, and interacting with persons with significantly reduced visual acuity;

    b. Adopt and enforce policies and procedures for providing clear and express non-visual forms of identification of both the deputies present and the threat of force to be administered, including the use of techniques which de-escalate tense situations and begin with non-lethal verbal communication techniques;

    c. Train and supervise County of Orange and OCSD deputies and employees to communicate effectively, control, and interact with persons with visual disabilities;

    d. Train and supervise County of Orange and OCSD deputies and employees to

effectively recognize persons with visual disabilities; and

e. Train and supervise County of Orange and OCSD deputies and employees that they should not use force, or put themselves in positions where the use of force may become necessary without first notifying and obtaining the assistance of persons who have the requisite training and experience in communicating effectively with and controlling and interacting with persons with visual impairments and disabilities.

105.   As a direct and proximate result of the aforementioned acts, including but not limited to Defendants deliberate indifference to the violation of Mr. Mono's federally protected rights, Mr. Mono suffered, and Plaintiffs suffered and continue to suffer humiliation, hardship, anxiety, and indignity, and severe mental and emotional anguish, and Mr. Mono was killed.

106.   Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to recover the compensatory damages described herein, and reasonable attorneys' fees and costs incurred in bringing this action.

## SEVENTH CAUSE OF ACTION

**Violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794)**

**(All Plaintiffs, as Successors in Interest of Decedent Paul Mono,**

**Against County of Orange)**

107.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

108.   On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

109.   Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits, or be subjected to discrimination under any program or activity receiving federal financial

assistance . . . ." 29 U.S.C. § 794.

110.    Mr. Mono, at all times relevant herein, was a qualified individual with a disability within the meaning of the Rehabilitation Act because he suffered from severe visual impairment due to retinitis pigmentosa, an impairment that substantially limited one or more of his major life activities. *See* 29 U.S.C. § 705(20)(B).

111.    At all times relevant to this action, Defendant County of Orange was a recipient of federal funding within the meaning of the Rehabilitation Act.

112.    Through their acts and omissions described herein, Defendant County of Orange has violated the Rehabilitation Act, including all applicable implementing regulations, by excluding Mr. Mono from participation in, denying him the benefits of, and subjecting him to discrimination in the benefits and services they provide to the general public.

113.    As a direct and proximate result of the aforementioned acts, including but not limited to Defendant's deliberate indifference to the violation of Mr. Mono's federally protected rights, Mr. Mono suffered great pain, suffering and death, and Plaintiffs have suffered and continue to suffer humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.

114.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to recover the damages described in this Complaint and reasonable attorneys' fees and costs incurred in bringing this action.

## EIGHTH CAUSE OF ACTION

### Wrongful Death

### (All Plaintiffs Against All Defendants)

115.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

116.    Mr. Mono's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants. Defendants Montoya and Johnson's shooting death of Mr. Mono was unjustified, unlawful, and

unnecessary under the circumstances, given that Mr. Mono was unarmed, visually impaired, and did not place any of the Deputy Defendants or any member of the public in any danger.

117.   Specifically, Deputy Defendants ignored established law enforcement practices and initiated an aggressive interaction with Mr. Mono that quickly escalated into the intentional and deliberate killing of a legally blind senior citizen who clearly posed no threat to the deputies or anyone else. No facts justify Montoya and Johnson's killing of Mr. Mono. There was no reasonable basis for the deputies to perceive any threat from Mr. Mono.

118.   The incident occurred in a safe and quiet senior-living retirement community. The Defendant Deputies were informed by Mr. Mono that he was blind. Moreover, Mr. Mono was also visually identifiable as blind: at the time of the incident, he was wearing his sunglasses and holding his blind assistance cane. At no point did Mr. Mono make any comment to the deputies, or take any action, to create a reasonable belief that he posed any danger to the Defendant Deputies or anyone else.

119.   Even if the Defendant Deputies had felt threatened, moreover, they had plenty of options that would have avoided the use of force. For example, the Defendant Deputies could have established a perimeter before engaging with Mr. Mono to ensure that no members of the public would walk into harm's way and that there was a clear avenue to observe and communicate with Mr. Mono. One of the Defendant Deputies also could have stopped to speak to both Mr. Metzler to confirm the details of the call and Ms. Heflin to ensure her safety and gather important details concerning the threat, or lack thereof, posed by Mr. Mono. In addition, the Defendant Deputies could have engaged in an open and non-threatening conversation with Mr. Mono in order to properly identify themselves and accurately assess the lack of any danger posed by an elderly blind man resting in his home. Finally, the Defendant Deputies could have employed techniques to de-escalate the situation, rather than needlessly rushing to approach the residence with their guns drawn and pointing their guns and shouting at

Mr. Mono and Ms. Peck. Had the Defendant Deputies implemented these strategies, they would have realized that Mr. Mono was in fact severely visually impaired and posed no threat to the Defendant Deputies or anyone else. The Deputy Defendants did none of the above, however. Instead, they ignored established police practices, ignored the fact that Mr. Mono was blind, initiated an unnecessary interaction with Mr. Mono, pointed their guns and shouted orders at Mr. Mono, and, when Mr. Mono questioned their actions, shot Mr. Mono multiple times, killing him.

120.   Defendants' acts and/or omissions thus were a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

121.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs incurred funeral and burial expenses in an amount to be proved at trial.

122.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of Mr. Mono's services, society, care, comfort, support, protection, gifts and benefits, as well as the loss of the present value of his future services to them for the remainder of their lives.

123.   Plaintiffs are further entitled to recover prejudgment interest.

124.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## NINTH CAUSE OF ACTION

### Cal. Civil Code § 52.1 – Bane Act

### (All Plaintiffs, as Successors in Interest of Decedent Paul Mono,
### Against All Defendants)

125.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

126.   On or about February 6, 2018, after causes of action arose in his favor,

Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

127.   The California Constitution Art. I, § 13 and the United States Constitution, Amendment IV, guarantee the right of persons to be free from arrests without probable cause, unreasonable searches and seizures, and use of unnecessary and excessive force on the part of law enforcement officers. Defendants, by engaging in the wrongful acts and failures to act alleged in this action, denied this right to Mr. Mono by threats, intimidation, or coercion, either intentionally or through their deliberate indifference. Defendant Deputies' unlawful actions were a substantial factor causing Mr. Mono's death and also severe injuries and suffering prior to his death. For this reason, Plaintiffs, as successors in interest to Mr. Mono, may state a claim for damages pursuant to Civil Code section 52.1.

128.   Article I, § 2 of the California Constitution and the First Amendment to the United States Constitution guarantee the right of persons to engage in protected speech. Defendants, by engaging in the wrongful acts and failures to act alleged herein, denied this right to Mr. Mono by threats, intimidation, or coercion, either intentionally or through their deliberate indifference, thus giving Plaintiffs a claim for damages pursuant to Cal. Civ. Code § 52.1. Specifically, the Defendant Deputies retaliated against Mr. Mono for his exercise of his constitutional right to engage in protected speech. The Defendant Deputies' unlawful actions were a substantial factor causing Mr. Mono's death and also severe injuries and suffering prior to his death.

129.   As the direct and legal result of Defendants' conduct, Plaintiffs suffered and will continue to suffer damages, including but not limited to those set forth above. Plaintiffs are entitled to statutory damages under Civil Code section 52, as well as compensatory and punitive damages and attorneys' fees.

/ / /

/ / /

/ / /

# TENTH CAUSE OF ACTION

## Assault

**(All Plaintiffs, as Successors in Interest of Decedent Paul Mono,**

**Against Defendants County of Orange, Montoya, Johnson, and Does 1-10)**

130.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

131.    On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

132.    Defendants Montoya and Johnson acted, intending to cause harmful or offensive contact with Mr. Mono, and threatened to touch Mr. Mono in a harmful or offensive manner.

133.    Mr. Mono reasonably believed that he was about to be touched in a harmful or offensive manner, and it reasonably appeared to Mr. Mono that Defendants were about to carry out their threats.

134.    Mr. Mono did not consent to Defendants' conduct.

135.    Mr. Mono was harmed.

136.    Defendants' conduct was a substantial factor in causing Mr. Mono's harm.

137.    The County of Orange is vicariously liable for the actions of the Deputy Defendants.

138.    Defendant Montoya and Johnson's conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

/ / /

/ / /

/ / /

## ELEVENTH CAUSE OF ACTION

### Battery

**(All Plaintiffs, as Successors in Interest of Decedent Paul Mono,**

**Against Defendants County of Orange, Montoya, Johnson, and Does 1-10)**

139.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

140.   On or about February 6, 2018, after causes of action arose in his favor, Decedent Paul Mono would have been a Plaintiff in this action had he survived the injuries he sustained.

141.   Defendants Montoya and Johnson intentionally touched Mr. Mono, or caused him to be touched.

142.   Defendants Montoya and Johnson used unreasonable force. Defendants had reason to believe Mr. Mono was visually disabled. Until they violently attacked and provoked him, Mr. Mono remained in his home and presented no threat to another person.

143.   Mr. Mono did not consent to the use of that force.

144.   Mr. Mono was harmed. As a result of the conduct of the Defendants as alleged herein, Mr. Mono sustained and incurred damages for a measurable period of time him before his death, bleeding out on his living room floor and dying alone at the hospital. Plaintiffs, as successors in interest to Paul Mono, therefore, seeks recovery for personal property damages, and all other related expenses, damages, and losses, as permitted by § 377.34 of the Code of Civil Procedure, against Defendants, according to proof at trial.

145.   The use of unreasonable force by Defendants Montoya and Johnson was a substantial factor in causing Mr. Mono's harm.

146.   The County of Orange is vicariously liable for the actions of the Deputy Defendants.

147.   Defendant Montoya and Johnson's conduct was willful, wanton, malicious,

and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## TWELFTH CAUSE OF ACTION

### Negligence

### (All Plaintiffs, as Successors in Interest of Decedent Paul Mono, Against All Defendants)

148.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

149.   Defendants' actions and omissions resulting in Mr. Mono's were the result of their negligent failure to abide by the standard of care imposed upon law enforcement departments and deputies who regularly interact with individuals who are visually impaired or disabled. Instead of the numerous non- or minimally lethal options available to them, the Defendant Deputies chose instead to use deadly force in contravention of established practices and established standards of care.

150.   As a direct result of Defendants' conduct, which included an unnecessary attempt to seize, arrest, and use excessive force upon Mr. Mono, Plaintiffs were injured.

151.   The acts and failures to act as alleged herein caused severe anxiety, pain, suffering and emotional distress and injury to Plaintiffs, and each of them, and Plaintiffs are therefore entitled to damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Plaintiff Peck against Defendants County of Orange, Montoya, Johnson, and Does 1-10)

152.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

153.   Plaintiff Susan Peck was standing only feet away from Mr. Mono, her husband, when Defendants Montoya and Johnson gunned him down. The Defendant

Deputies saw Ms. Peck through the large living room windows of her home and saw that she was frozen in fear of the guns the officers were aiming into her residence. Defendants Montoya and Johnson then shot and killed Mr. Mono in front of Ms. Peck. Following this traumatizing action, the Defendant Deputies then placed Ms. Peck in handcuffs and walked her out of her residence and through her senior living community while he hands shackled behind her back. The Defendant Deputies then locked Ms. Peck in a police car until she was able to be interviewed. The conduct of the Defendant Deputies was plainly outrageous.

154.   Deputies Montoya and Johnson shot and killed Mr. Mono in front of Ms. Peck with reckless disregard to the emotional distress that she would experience and with the intent that Ms. Peck would suffer emotional distress from the shooting. This is exemplified by the violent nature of the shooting without regard to Ms. Peck's safety and proximity to Mr. Mono and the callous nature of the deputies' act of handcuffing Ms. Peck at her husband's body.

155.   Ms. Peck fell to the ground after the shots started and crawled to Mr. Mono's bleeding body. Ms. Peck feared that Mr. Mono was dead after the barrage of gunshots and attempted to check on him. Ms. Peck was able to see that Mr. Mono's eyes were glazed over. She was then handcuffed and taken away from Mr. Mono's body by the Defendant Deputies. Ms. Peck believed at the time that Mr. Mono was dead as a result of the gunshot wounds. Her belief was confirmed later that evening when she was released from custody.

156.   Upon seeing Mr. Mono gunned down at the scene, Ms. Peck suffered severe mental anguish and trauma. Since the incident, Ms. Peck has suffered recurring signs of depression and Post Traumatic Stress Disorder. She was unable to bring herself to return to live in the home she previously shared with Mr. Mono, and she had to take time to recuperate with family members away from the community in which the killing took place.

157.   The Defendant Deputies' actions of surrounding the residence of Mr. Mono

and Ms. Peck, aiming guns towards Mr. Mono and Ms. Peck, shouting orders at Mr. Mono, and ultimately of shooting Mr. Mono to death in front of Ms. Peck while she stood only feet away and could potentially have been hit herself were all substantial factors in causing Ms. Peck's serious emotional distress.

158.   Defendant County of Orange is vicariously liable for the actions of the Defendant Deputies who are its employees and agents.

159.   The acts and failures to act as alleged herein caused severe anxiety, pain, suffering and emotional distress and injury to Ms. Peck and she is therefore entitled to damages in an amount to be proven at trial.

160.   Moreover, the Defendant Deputies' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## FOURTEENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

### (Plaintiff Peck against Defendants County of Orange,

### Montoya, Johnson, and Does 1-10)

161.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

162.   Plaintiff Susan Peck was standing only feet away from Mr. Mono, her husband, when Defendants Montoya and Johnson negligently gunned him down. The Defendant Deputies saw Ms. Peck through the large living room windows of her home and saw that she was frozen in fear of the guns the officers were aiming into her residence. Defendants Montoya and Johnson then shot and killed Mr. Mono in front of Ms. Peck. Following this traumatizing action, the Defendant Deputies then placed Ms. Peck in handcuffs and walked her out of her residence and through her senior living community while he hands shackled behind her back. The Defendant Deputies then locked Ms. Peck in a police car until she was able to be interviewed.

163.   Ms. Peck fell to the ground after the shots started and crawled to Mr. Mono's bleeding body. Ms. Peck feared that Mr. Mono was dead after the barrage of gunshots and attempted to check on him. Ms. Peck was able to see that Mr. Mono's eyes were glazed over. She was then handcuffed and taken away from Mr. Mono's body by the Defendant Deputies. Ms. Peck believed at the time that Mr. Mono was dead as a result of the gunshot wounds. Her belief was confirmed later that evening when she was informed of Mr. Mono's death while she was still in custody.

164.   Upon seeing Mr. Mono gunned down at the scene, Ms. Peck suffered severe mental anguish and trauma. Since the incident, Ms. Peck has suffered recurring signs of depression and Post Traumatic Stress Disorder. She was unable to bring herself to return to live in the home she previously shared with Mr. Mono, and she had to take time to recuperate with family members away from the community in which the killing took place.

165.   The Defendant Deputies' actions of surrounding the residence of Mr. Mono and Ms. Peck, aiming guns towards Mr. Mono and Ms. Peck, shouting orders at Mr. Mono, and ultimately of shooting Mr. Mono to death in front of Ms. Peck while she stood only feet away and could potentially have been hit herself were all substantial factors in causing Ms. Peck's serious emotional distress.

166.   Defendant County of Orange is vicariously liable for the actions of the Defendant Deputies who are its employees and agents.

167.   The acts and failures to act as alleged herein caused severe anxiety, pain, suffering and emotional distress and injury to Ms. Peck and she is therefore entitled to damages in an amount to be proven at trial.

168.   Moreover, the Defendant Deputies' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

/ / /

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     For compensatory, general, and special damages against each Defendant, jointly and severally, amounts to be proven at trial;

2.     Punitive and exemplary damages against individually named Defendants Hutchens, Carrington, Frey, Johnson, Montoya, Lind, McFatridge, and Does 1-10, in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

3.     Prejudgment interest;

4.     For costs of suit and reasonable attorneys' fees and costs as authorized by statute or law;

5.     For restitution as the Court deems just and proper;

6.     For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury in this action.

Dated: May 29, 2019                Respectfully Submitted,

HADSELL STORMER & RENICK LLP


By: _/s/ - Joshua J. Nuni_____
        Dan Stormer
        Joshua Piovia-Scott
        Joshua J. Nuni
        Attorneys for Plaintiffs