Barbara Enloe Hadsell, Esq. [S.B. #086021]
Dan Stormer, Esq. [S.B. #101967]
David Clay Washington, Esq. [S.B. #305996]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: bhadsell@hadsellstormer.com
        dstormer@hadsellstormer.com
        dwashington@hadsellstormer.com

Attorneys for Plaintiff
SUSAN PECK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN PECK, individually and as surviving heir and successor in interest of PAUL MONO (deceased),<br><br>       Plaintiff,<br><br>   vs.<br><br>COUNTY OF ORANGE, SHERIFF-CORONER SANDRA HUTCHENS, in her individual and official capacities, ANTHONY MONTOYA, MICHAEL JOHNSON, BRAD CARRINGTON, BRENT LIND, JOHN FREY, AARON McFATRIDGE, and DOES 1-10,<br><br>       Defendants. | Case No.:  2:19-cv-04654 DSF (AFMx)<br><br>[Assigned to the Honorable Dale S. Fischer – Courtroom 7D]<br><br>**PLAINTIFF'S AMENDED MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>FPTC:      April 24, 2023<br>TIME:     3:00 p.m.<br>CRTRM:   7D (First Street Courthouse)<br><br>Complaint filed:  May 31, 2019<br>Exp Disc Cut-Off: October 23, 2020<br>Motion Cut-Off:  November 16, 2020<br>Trial Date:     May 23, 2023 |

# TABLE OF CONTENTS

**Page(s)**

1.  Claims and Defenses (L.R. 16-4.1)............................................................................1

    Elements of these Claims ........................................................................................1

    Elements of Plaintiffs' 42 U.S.C. Section 1983 Claims Against
    Individual Defendants Generally ............................................................................1

    Claim 1: Plaintiff, as representative of the Estate of Paul Mono, has claims
    for Excessive Force under the Fourth Amendment under 42 U.S.C. § 1983
    against Defendants Montoya and Johnson................................................................2

    Elements Required to Establish Plaintiff Estate's Claim No. 1 ...............................2

    Key Evidence in Support of Claim 1 ......................................................................4

    Claim 2: Plaintiff has a claim against the County of Orange for its own
    liability for the acts and failures to act of the individual Defendants pursuant
    to the doctrine of municipal liability established by *Monell v. Department of
    Social Services*, 436 U.S. 658 (1978)......................................................................9

    Elements Required to Establish Plaintiffs' Claim No. 2...........................................9

    Key Evidence in Support of Claim 2 ......................................................................12

    Claim 3: Plaintiff Estate has a claim for Discrimination on the basis of
    Disability under Title II of the Americans with Disabilities Act, 42 U.S.C.
    §§ 12131 *et seq*.......................................................................................................16

    Elements Required to Establish Plaintiff's Claim No. 3..........................................17

    Key Evidence in Support of Claim 3 ......................................................................17

    Claim 4: Plaintiff Estate has a claim for Discrimination on the basis of
    Disability under Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 791,
    *et seq*......................................................................................................................22

    Elements Required to Establish Plaintiff's Claim No. 4..........................................22

Key Evidence in Support of Claim 4 .................................................................23

Claim 5: Plaintiff Susan Peck has a claim for Wrongful Death under California law .................................................................................................27

Elements Required to Establish Plaintiff's Claim No. 5...............................28

Key Evidence in Support of Claim 5 .............................................................28

2.    Evidentiary Issues and Issues of Law ....................................................33

3.    Bifurcation of Issues (L.R. 16-4.3) .......................................................34

4.    Jury Trial (L.R. 16-4.4) .........................................................................34

5.    Attorneys' Fees (L.R. 16-4.5) ................................................................34

6.    Abandonment of Issues (L.R. 16-4.6)....................................................35

Plaintiff Susan Peck, in her personal capacity and as representative of Paul Mono's Estate ("Plaintiffs," collectively), submit their Amended Memorandum of Contentions of Fact and Law pursuant to Local Rule 16-4.

## 1.    Claims and Defenses (L.R. 16-4.1)

Pursuant to this Court's November 18, 2020 and March 25, 2021 Orders granting in part and denying in part Defendants' Motion for Summary Judgment, or in the Alternative, Motion for Partial Summary Adjudication (Dkt Nos. 108, 170) and the Ninth Circuit's ruling on Defendants' appeal (Dkt. No. 189) Plaintiffs have pled and currently plan to pursue the following claims at trial:[1]

1.    42 U.S.C. § 1983 - Excessive Force

2.    42 U.S.C. § 1983 – *Monell* Liability

3.    Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 et seq.

4.    Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 791 et seq.

5.    Wrongful Death: Negligence

**Elements of these Claims**

Elements of Plaintiffs' 42 U.S.C. Section 1983 Claims Against Individual Defendants Generally

Pursuant to this Court's Summary Judgment Order, Plaintiff, as representative of the estate of Paul Mono, presently has claims for Excessive Force against Defendants Anthony Montoya and Michael Johnson pursuant to 42 U.S.C. § 1983.  These claims require the following elements of proof, in addition to the elements regarding that specific claim:

1.    The individual Defendant acted under color of state law; and

---

[1] The Court has yet to rule on Defendants' Motion for Summary Judgment as to Plaintiff Estate's Excessive Force Claim (and resultant Due Process Deprivation Claim) against the non-shooting Defendant deputies (Carrington, Lind, and Frey). As such, this Memorandum of Contentions of Facts and Law includes those claims.

2.    The acts and/or failure to act of the individual Defendant deprived Paul Mono of his particular rights under the laws of the United States and/or the United States Constitution.

There is no dispute that the individual Defendants acted under color of state law, thus only the second element is in dispute and must be established as set out below. (Ninth Circuit Manual of Model Civil Jury Instructions § 9.3).

**Claim 1**: Plaintiff, as representative of the Estate of Paul Mono, has claims for Excessive Force under the Fourth Amendment under 42 U.S.C. § 1983 against Defendants Montoya and Johnson.

Elements Required to Establish Plaintiff Estate's Claim No. 1:

In order to prevail on its Excessive Force claim against Defendants Lind, Carrington, and Frey, Plaintiff Estate must show:

1.    Defendants Montoya and/or Johnson  seized Paul Mono's person;

2.    In seizing Paul Mono's person, Defendants Montoya and/or Johnson acted intentionally; and

3.    The seizure was unreasonable.

In general, a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in making a lawful arrest and/or in defending himself or others. Therefore, in order to prove an unreasonable seizure in this case, the Plaintiff Estate must prove by a preponderance of the evidence that Defendants Montoya and/or Johnson used excessive force against Mr. Mono when they drew their guns and pointed them at Mr. Mono, and/or shot him multiple times.

Under the Fourth Amendment, a police officer may use only such force as is "objectively reasonable" under all of the circumstances. The jury must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight. Although the facts known to the

officer are relevant to your inquiry, an officer's subjective intent or motive is not relevant to the jury's inquiry.

In determining whether the officer used excessive force in this case, the jury should consider all of the circumstances known to the officer on the scene, including:

1. the nature of the crime or other circumstances known to the officer at the time force was applied;

2. whether Mr. Mono posed an immediate threat to the safety of the officer or to others;

3. whether Mr. Mono was actively resisting arrest or attempting to evade arrest by flight;

4. the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;

5. the type and amount of force used;

6. the availability of alternative methods to subdue Mr. Mono;

7. the number of lives at risk (motorists, pedestrians, police officers) and the parties' relative culpability; i.e., which party created the dangerous situation, and which party is more innocent;

8. whether it was practical for the officer to give warning of the imminent use of force, and whether such warning was given;

9. whether it should have been apparent to the officer that the person he used force against was emotionally disturbed;

10. whether it should have been apparent to the officer that the person he used force against was visually impaired;

11. whether a reasonable officer would have or should have accurately perceived a mistaken fact; and

12. whether there was probable cause for a reasonable officer to believe that Mr. Mono had committed a crime involving the infliction or threatened

1    infliction of serious physical harm.

2    "Probable cause" exists when, under all of the circumstances known to the officer

3    at the time, an objectively reasonable police officer would conclude there is a fair

4    probability that Mr. Mono has committed or was committing a crime.

5

6    (Ninth Circuit Manual of Model Civil Jury Instructions §§ 9.20 & 9.25)

7

8    **Key Evidence in Support of Claim 1:**

9    In 2016, Paul Mono and his wife Susan Peck obtained the services of real estate

10   agent Jennifer Heflin to assist them in purchasing a residence in Laguna Woods Village, a

11   private retirement community. Mr. Mono's eyesight was nearly gone due to retinitis

12   pigmentosa, a degenerative disease that affects vision. They decided to relocate to Marina

13   del Rey to an area that would be safer for Mr. Mono to navigate in light of his condition.

14   At the time of his death, Mr. Mono had just 10% of his eyesight left.  Mr. Mono also had

15   experienced escalating depression as a result of a cascade of difficult events that ensued

16   upon the couple's move to Laguna Woods Village, including a severe flu requiring

17   hospitalization, structural problems in their home caused by Dennis Metzler, a contractor

18   whom they had hired to retrofit the home in order to make it accessible for Mr. Mono in

19   light of his disability, and a recent assault of Mr. Mono at the hands of an electrician hired

20   by Metzler. Ms. Heflin had recommended Metzler to the couple.

21   On February 5, 2018, Ms. Heflin came to the residence to assess remaining remodel

22   issues. During this visit, the couple repeatedly told Ms. Heflin that they wanted to find

23   someone else to finish the work in light of Metzler's ballooning budget and failures. At

24   some point during this visit, Mr. Mono showed Ms. Heflin an unloaded revolver that he

25   owned. The bullets were kept separately in a plastic bag away from the gun, and at no point

26   did Ms. Heflin fear for her safety. She viewed Mr. Mono as a "good person" who would

27   "never hurt her."

28   In order to proceed with severing their agreement with Metzler to find a new

contractor, the couple needed floor plans that were in Metzler's possession. Ms. Heflin contacted Metzler, who agreed to give her the floor plans the next day at a carport near the home. She told Metzler that she did not think it was a good idea for him to interact with Mr. Mono give how upset Mr. Mono was with him. On February 6, 2018, Ms. Heflin met Metzler in the carport and got the floor plans. Metzler, who was upset that he had lost what had become (for him) a more-lucrative-by-the-day deal with the couple, tried to dissuade Heflin from entering the home and delivering the floor plans. To placate him, Ms. Heflin told him that she would call him and keep her phone on while in the residence.

When Ms. Heflin was in the residence, Mr. Mono became upset because the plans the couple was given were incorrect. Learning that Metzler was standing in the carport nearby, Mr. Mono devolved into a mental health episode. Metzler called 911, stating he could hear Mr. Mono threatening him over a phone held by Ms. Heflin, who was inside the Mono-Peck home. Ms. Heflin, unaware that Metzler had called the police, left the residence, hugged Mr. Mono and Ms. Peck goodbye, and told them she would see them the next day. Ms. Heflin walked back to Metzler and learned he had called 911, which upset her greatly, as she was not in any danger. Moments later, Defendants Frey, Montoya, Johnson, Carrington, and Lind arrived, rushing past Ms. Heflin, who was now standing with Metzler out in the open near a carport.

Ms. Heflin was the only witness to Mr. Mono's conduct, but Defendants ignored her. Frey arrived first and, had he followed policy, would have spoken to Heflin whom he knew had just been inside the Mono home, and taken the role of primary unit. He did neither. Neither Frey nor any other Defendant made any attempt to speak to Heflin at all (nor did any other Defendant). If they had, she would have told them that Mr. Mono was nearly blind and experiencing a mental health crisis, but was calm, non-threatening, and not dangerous. Frey admits he spoke to Metzler for 30 seconds and then only to ask who had placed the 911 call. Frey failed to inquire into Metzler's relationship with Mr. Mono, and therefore remained ignorant that Metzler had not been inside the Mono-Peck home for months, and had ill-will toward Mr. Mono because of a heated dispute over Metzler's

1    incomplete and shoddy repairs to the home. Frey failed to communicate to the other

2    Defendants what little he did learn from Metzler, other than having a "very brief"

3    conversation with Montoya in which he "probably" told him what Metzler had said.

4    Defendant Montoya stated that he didn't know whether Mr. Mono had been seen waving a

5    gun around that day, and he didn't have enough facts to determine probable cause.

6    Defendants' failure to obtain critical information from Metzler and Ms. Heflin contravened

7    state-mandated POST training and purported OCSD policy, and doomed Defendants'

8    tactical response from the start.

9         Defendants admit no discussion was had among them regarding any tactical plan.

10   Rather, Frey, Montoya, Johnson, Carrington, and Lind arrived and rushed up to the home.

11   They pressed directly up against the windows with weapons drawn. For the entirety of the

12   encounter save for the final few seconds, Defendants variously drew their guns and stood

13   inches away from the glass windows and door of the home, observing no gun, only a

14   frantic 64-year-old man with a red-tipped cane held above his head and at various times

15   flailing with it. The first arriving and senior officers (Frey and Carrington) failed to take

16   charge in violation of purported policy and training. Defendants admit Mr. Mono paced

17   about with his cane yelling "nonsense," random profanities, suicidal ideation, identifying

18   himself as blind and deaf, switching back and forth between English and Spanish, and

19   exposing his buttocks and genitals. Mr. Mono yelled repeatedly "just shoot me." Neighbor

20   Marsha Berman testified that Mr. Mono was acting "crazy" and "like a lunatic." Ms.

21   Berman also testified that Mr. Mono was wearing dark sunglasses and carrying a "blind

22   person's cane." To Defendants, this behavior and presentation suggested *only* that Mr.

23   Mono "had an issue with law enforcement authority", was "uncooperative;" it was not

24   indicative of any potential mental health issues or visual impairment.

25         Ms. Heflin had relevant, recent information concerning Mr. Mono's visual and

26   mental impairments. Their own observations would have substantiated this, including Mr.

27   Mono's (1) stating repeatedly he was blind, (2) use of a white, red-tipped cane which he

28   flailed about, and (3) wearing dark sunglasses indoors. These are clear indicators of visual

1    and mental impairment on which Defendants claim to be trained.

2         Further, there was no urgency. Ms. Heflin and Mr. Metzler, against whom Mr.

3    Mono's threats had allegedly been made, stood outside near the home. Neighbors Larry

4    and Marsha Berman and Shirley Heaton stood directly in front of the living room window

5    through which Johnson eventually fired his weapon, 100 feet away, and watched the entire

6    encounter. Indeed, at no time prior to the shooting did Frey feel that he, Mr. Metzler or the

7    neighbors were in danger. Ms. Heflin, who had seen Mr. Mono in his residence waving a

8    gun over his head for 30 seconds, was never fearful for her safety and would have told

9    Defendants so, had they bothered to speak to her. Lacking urgency, Defendants created the

10   situation, and then used their self-created escalation as justification for killing Mr. Mono.

11        Following a yelling match between Defendants and Mr. Mono, Frey radioed "He's

12   refusing to come out, he's refusing to let us in, we're at a stalemate." Rather than using this

13   time to retreat from their positions, discuss a tactical plan, wait for the Critical Incident

14   Response Team ("CIRT") that was already en route, call upon the Crisis Assessment Team

15   ("CAT"), Crisis Negotiation Team, or SWAT team, Defendants remained where they

16   were, pressed up against the windows, yelling at Mr. Mono. They failed to follow the

17   orders of Sergeant McFatridge, who was not yet at the scene, to "set up a perimeter" and

18   "confirm with informant." All of these decisions were contrary to policy.

19        Within seconds of allegedly noticing a holstered revolver on the couch located along

20   the eastern wall of the apartment, Montoya and Johnson killed Mr. Mono, giving

21   conflicting versions of Mr. Mono's final movements, neither of which conform with the

22   physical evidence or eyewitness testimony. According to Plaintiff's ballistics expert David

23   Balash, Defendants' investigation was "superficial at best." Defendants performed no

24   analysis of the bullet trajectories, of the firing sequence, or of fingerprints on the holstered,

25   unloaded gun recovered from the scene. Despite the glaring inadequacies of the

26   investigation, Defendant County of Orange "exonerated" all Defendants. According to

27   Plaintiff's Ballistics Expert (for whom Defendants have offered no rebuttal), the only

28   possible explanations for the gravely flawed investigation are "investigative indifference"

1  or "directions from command authorities on what will and will not be examined."

2  Moreover, physical evidence and eyewitness testimony directly contradict

3  Defendants' testimony regarding Mr. Mono's movements during the final few seconds of

4  the encounter. Montoya and Johnson allege they saw a gun on the couch along the east

5  wall of the living room. Montoya states he started shooting when, after grabbing the gun,

6  Mr. Mono turned north and lifted the gun to point it at Johnson. But all of the bullets from

7  Montoya's gun entered Mr. Mono's body from behind, indicating Mr. Mono was standing

8  upright facing east toward the couch, not north toward Johnson as Montoya testified.

9  Furthermore, Dr. Scott Luzi, the coroner who conducted the autopsy, determined that the

10  cranial bullet wound associated with Montoya's gun would have made Mr. Mono collapse

11  *immediately*, indicating that Mr. Mono was standing upright and facing the eastern wall

12  when he fell to the floor from the bullet fired into his skull from behind by Montoya.

13  Contrarily, Johnson states he fired immediately upon seeing Mr. Mono facing east,

14  reaching for the gun on the couch. But all of the bullets from Johnson's gun entered from

15  the front downward, indicating that Mr. Mono's torso was "parallel to the floor," oriented

16  north, not east toward the couch as Johnson testified. Furthermore, Johnson's testimony

17  that he stood stationary as he fired his weapon with only his hand moving is incredible, as

18  the pattern of holes created by his bullets clearly indicates that he was moving either east or

19  west as he fired. Lastly, an eyewitness, Mr. Larry Berman, testified that seconds before the

20  officers fired, Mr. Mono moved to the west, *away* from the purported location of the gun.

21  It is uncontested that a gun found at the scene was unloaded and holstered.

22  Defendants have provided no explanation as to why the gun was found underneath the

23  other side of the coffee table from Mr. Mono's body; nor have they explained why Frey

24  kept his foot on it for ten minutes, long after Defendants completed their alleged protective

25  sweep.

26  According to Plaintiff's Ballistics Expert, when Montoya delivered the crippling

27  head shot, Mr. Mono had to have been standing to the west/northwest of the coffee table,

28  away from the alleged location of the holstered, unloaded gun.

PLTF'S AMENDED MEMORANDUM OF
CONTENTIONS OF FACT & LAW

**Claim 2:** Plaintiff has a claim against the County of Orange for its own liability for the acts and failures to act of the individual Defendants pursuant to the doctrine of municipal liability established by *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Elements Required to Establish Plaintiffs' Claim No. 2:

Plaintiffs have brought a claim against Defendant County of Orange pursuant to 42 U.S.C. § 1983.  Plaintiff may prove this claim either one of two ways:

In order to prevail on each of their § 1983 claim against Defendant County of Orange based on ratification, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1.     Defendants Montoya and/or Johnson acted under color of state law;

2.     The act[s] of Defendants Montoya and/or Johnson (individually or collectively) [2] deprived Mr. Mono of his particular rights under the laws of the United States and/or the United States Constitution as explained in Claim 1;

3.     Defendant County of Orange, by and through a final policymaker, acted under color of state law;

4.     The final policymaker ratifying the acts and/or failures to act of Defendants Montoya and/or Johnson had final policymaking authority from Defendant County of Orange; and

5.     The final policymaker ratified Defendants Montoya and/or Johnson's acts and/or failures to act, that is, the final policymaker knew of and specifically

---

[2] This constitutional deprivation can result from the collective force of the individual Defendants, even if none of them individually violated Plaintiff Estate's constitutional rights.  *Horton v. City of Santa Maria*, 915 F.3d 592, 605 (9th Cir. 2019) ("We conclude that our holding that Officer Brice is entitled to qualified immunity does not preclude the possibility that a constitutional violation may nonetheless have taken place, including as a result of the collective acts or omissions of Santa Maria Police Department officers.").

1 | made a deliberate choice to approve their acts and/or failure to act and the
2 | basis for it.

3     A person acts "under color of state law" when the person acts or purports to act in
4 the performance of official duties under any state, county, or municipal law, ordinance
5 or regulation. There is no dispute that Defendants acted under of state law, and,
6 therefore, the first element requires no proof.

7     If the jury finds that Plaintiffs have proved these elements, its verdict should be
8 for Plaintiffs. If, on the other hand, the jury finds that Plaintiffs have failed to prove any
9 one or more of these elements, its verdict should be for the Defendant(s).

10

11     In order to prevail on his § 1983 claim against Defendant County of Orange
12 alleging liability based on a policy that fails to prevent violations of law by its police
13 officers, the plaintiff must prove each of the following elements by a preponderance of
14 the evidence:

15     1.    the acts and/or failure to act of Defendants Montoya and/or Johnson
16           deprived Mr. Mono of his particular rights under the United States
17           Constitution as explained in later instructions;

18     2.    Defendants Montoya and/or Johnson acted under color of state law;

19     3.    the investigation policies of Defendant County of Orange were not adequate
20           to prevent violations of law by its employees;

21     4.    Defendant County of Orange was deliberately indifferent to the substantial
22           risk that its investigation policies were inadequate to prevent violations of
23           law by its employees; and

24     5.    the failure of Defendant County of Orange to prevent violations of law by
25           its employees caused the deprivation of the plaintiff's rights by Defendants
26           Montoya and/or Johnson, that is, Defendant County of Orange's failure to
27           prevent violations of law by its employees played a substantial part in
28           bringing about or actually causing the injury or damage to the plaintiff.

1    A person acts "under color of state law" when the person acts or purports to

2    act in the performance of official duties under any state, county, or municipal law,

3    ordinance or regulation. There is no dispute that Defendants acted under of state law,

4    and, therefore, the first element requires no proof.

5    A policy is a deliberate choice to follow a course of action made from among

6    various alternatives by the official or officials responsible for establishing final policy

7    with respect to the subject matter in question.  A policy of inaction or omission may be

8    based on a failure to implement procedural safeguards to prevent constitutional

9    violations.  To establish that there is a policy based on a failure to preserve constitutional

10   rights, the plaintiff must show, in addition to a constitutional violation, that this policy

11   amounts to deliberate indifference to the plaintiff's constitutional rights, and that the

12   policy caused the violation, in the sense that the municipality could have prevented the

13   violation with an appropriate policy.

14   "Deliberate indifference" is the conscious choice to disregard the

15   consequences of one's acts or omissions.  The plaintiff may prove deliberate

16   indifference in this case by showing that the facts available to Defendant County of

17   Orange put it on actual or constructive notice that its failure to implement adequate

18   investigation policies was substantially certain to result in the violation of the

19   constitutional rights of persons such as the plaintiff due to police officers' conduct.

20   If the jury finds that the plaintiff has proved each of these elements, and if

21   the jury finds that the plaintiff has proved all the elements she is required to prove under

22   her first Claim the jury's verdict should be for the plaintiff.  If, on the other hand, the

23   plaintiff has failed to prove any one or more of these elements, the jury's verdict should

24   be for the defendant.

25

26   (Ninth Circuit Manual of Model Civil Jury Instructions §§§§ 9.32, 9.5, 9.6, 9.7 and 9.8);

27   *Horton v. City of Santa Maria*, 915 F.3d 592, 605 (9th Cir. 2019); *Lemire v. Cal. Dep't*

28   *of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013); *Hayes v. County of San Diego*,

736 F.3d 1223, 1230 (9th Cir. 2013); This Court's Summary Judgment Order, Dkt. No. 108 at 21, n. 8.

**Key Evidence in Support of Claim 2:**

In 2016, Paul Mono and his wife Susan Peck obtained the services of real estate agent Jennifer Heflin to assist them in purchasing a residence in Laguna Woods Village, a private retirement community. Mr. Mono's eyesight was nearly gone due to retinitis pigmentosa, a degenerative disease that affects vision. They decided to relocate to Marina del Rey to an area that would be safer for Mr. Mono to navigate in light of his condition. At the time of his death, Mr. Mono had just 10% of his eyesight left. Mr. Mono also had experienced escalating depression as a result of a cascade of difficult events that ensued upon the couple's move to Laguna Woods Village, including a severe flu requiring hospitalization, structural problems in their home caused by Dennis Metzler, a contractor whom they had hired to retrofit the home in order to make it accessible for Mr. Mono in light of his disability, and a recent assault of Mr. Mono at the hands of an electrician hired by Metzler. Ms. Heflin had recommended Metzler to the couple.

On February 5, 2018, Ms. Heflin came to the residence to assess remaining remodel issues. During this visit, the couple repeatedly told Ms. Heflin that they wanted to find someone else to finish the work in light of Metzler's ballooning budget and failures. At some point during this visit, Mr. Mono showed Ms. Heflin an unloaded revolver that he owned. The bullets were kept separately in a plastic bag away from the gun, and at no point did Ms. Heflin fear for her safety. She viewed Mr. Mono as a "good person" who would "never hurt her."

In order to proceed with severing their agreement with Metzler to find a new contractor, the couple needed floor plans that were in Metzler's possession. Ms. Heflin contacted Metzler, who agreed to give her the floor plans the next day at a carport near the home. She told Metzler that she did not think it was a good idea for him to interact with Mr. Mono give how upset Mr. Mono was with him. On February 6, 2018, Ms. Heflin met

Metzler in the carport and got the floor plans. Metzler, who was upset that he had lost what had become (for him) a more-lucrative-by-the-day deal with the couple, tried to dissuade Heflin from entering the home and delivering the floor plans. To placate him, Ms. Heflin told him that she would call him and keep her phone on while in the residence.

When Ms. Heflin was in the residence, Mr. Mono became upset because the plans the couple was given were incorrect. Learning that Metzler was standing in the carport nearby, Mr. Mono devolved into a mental health episode. Metzler called 911, stating he could hear Mr. Mono threatening him over a phone held by Ms. Heflin, who was inside the Mono-Peck home. Ms. Heflin, unaware that Metzler had called the police, left the residence, hugged Mr. Mono and Ms. Peck goodbye, and told them she would see them the next day. Ms. Heflin walked back to Metzler and learned he had called 911, which upset her greatly, as she was not in any danger. Moments later, Defendants Frey, Montoya, Johnson, Carrington, and Lind arrived, rushing past Ms. Heflin, who was now standing with Metzler out in the open near a carport.

Ms. Heflin was the only witness to Mr. Mono's conduct, but Defendants ignored her. Frey arrived first and, had he followed policy, would have spoken to Heflin whom he knew had just been inside the Mono home, and taken the role of primary unit. He did neither. Neither Frey nor any other Defendant made any attempt to speak to Heflin at all (nor did any other Defendant). If they had, she would have told them that Mr. Mono was nearly blind and experiencing a mental health crisis, but was calm, non-threatening, and not dangerous. Frey admits he spoke to Metzler for 30 seconds and then only to ask who had placed the 911 call. Frey failed to inquire into Metzler's relationship with Mr. Mono, and therefore remained ignorant that Metzler had not been inside the Mono-Peck home for months, and had ill-will toward Mr. Mono because of a heated dispute over Metzler's incomplete and shoddy repairs to the home. Frey failed to communicate to the other Defendants what little he did learn from Metzler, other than having a "very brief" conversation with Montoya in which he "probably" told him what Metzler had said. Defendant Montoya stated that he didn't know whether Mr. Mono had been seen waving a

1  gun around that day, and he didn't have enough facts to determine probable cause.

2  Defendants' failure to obtain critical information from Metzler and Ms. Heflin contravened

3  state-mandated POST training and purported OCSD policy, and doomed Defendants'

4  tactical response from the start.

5        Defendants admit no discussion was had among them regarding any tactical plan.

6  Rather, Frey, Montoya, Johnson, Carrington, and Lind arrived and rushed up to the home.

7  They pressed directly up against the windows with weapons drawn. For the entirety of the

8  encounter save for the final few seconds, Defendants variously drew their guns and stood

9  inches away from the glass windows and door of the home, observing no gun, only a

10  frantic 64-year-old man with a red-tipped cane held above his head and at various times

11  flailing with it. The first arriving and senior officers (Frey and Carrington) failed to take

12  charge in violation of purported policy and training. Defendants admit Mr. Mono paced

13  about with his cane yelling "nonsense," random profanities, suicidal ideation, identifying

14  himself as blind and deaf, switching back and forth between English and Spanish, and

15  exposing his buttocks and genitals. Mr. Mono yelled repeatedly "just shoot me." Neighbor

16  Marsha Berman testified that Mr. Mono was acting "crazy" and "like a lunatic." Ms.

17  Berman also testified that Mr. Mono was wearing dark sunglasses and carrying a "blind

18  person's cane." To Defendants, this behavior and presentation suggested *only* that Mr.

19  Mono "had an issue with law enforcement authority", was "uncooperative;" it was not

20  indicative of any potential mental health issues or visual impairment.

21        Ms. Heflin had relevant, recent information concerning Mr. Mono's visual and

22  mental impairments. Their own observations would have substantiated this, including Mr.

23  Mono's (1) stating repeatedly he was blind, (2) use of a white, red-tipped cane which he

24  flailed about, and (3) wearing dark sunglasses indoors. These are clear indicators of visual

25  and mental impairment on which Defendants claim to be trained.

26        Further, there was no urgency.  Ms. Heflin and Mr. Metzler, against whom Mr.

27  Mono's threats had allegedly been made, stood outside near the home.  Neighbors Larry

28  and Marsha Berman and Shirley Heaton stood directly in front of the living room window

through which Johnson eventually fired his weapon, 100 feet away, and watched the entire encounter. Indeed, at no time prior to the shooting did Frey feel that he, Mr. Metzler or the neighbors were in danger. Ms. Heflin, who had seen Mr. Mono in his residence waving a gun over his head for 30 seconds, was never fearful for her safety and would have told Defendants so, had they bothered to speak to her. Lacking urgency, Defendants created the situation, and then used their self-created escalation as justification for killing Mr. Mono.

Following a yelling match between Defendants and Mr. Mono, Frey radioed "He's refusing to come out, he's refusing to let us in, we're at a stalemate." Rather than using this time to retreat from their positions, discuss a tactical plan, wait for the Critical Incident Response Team ("CIRT") that was already en route, call upon the Crisis Assessment Team ("CAT"), Crisis Negotiation Team, or SWAT team, Defendants remained where they were, pressed up against the windows, yelling at Mr. Mono. They failed to follow the orders of Sergeant McFatridge, who was not yet at the scene, to "set up a perimeter" and "confirm with informant." All of these decisions were contrary to policy.

Within seconds of allegedly noticing a holstered revolver on the couch located along the eastern wall of the apartment, Montoya and Johnson killed Mr. Mono, giving conflicting versions of Mr. Mono's final movements, neither of which conform with the physical evidence or eyewitness testimony. According to Plaintiff's ballistics expert David Balash, Defendants' investigation was "superficial at best." Defendants performed no analysis of the bullet trajectories, of the firing sequence, or of fingerprints on the holstered, unloaded gun recovered from the scene. Despite the glaring inadequacies of the investigation, Defendant County of Orange "exonerated" all Defendants. According to Plaintiff's Ballistics Expert (for whom Defendants have offered no rebuttal), the only possible explanations for the gravely flawed investigation are "investigative indifference" or "directions from command authorities on what will and will not be examined."

Moreover, physical evidence and eyewitness testimony directly contradict Defendants' testimony regarding Mr. Mono's movements during the final few seconds of the encounter. Montoya and Johnson allege they saw a gun on the couch along the east

wall of the living room. Montoya states he started shooting when, after grabbing the gun, Mr. Mono turned north and lifted the gun to point it at Johnson. But all of the bullets from Montoya's gun entered Mr. Mono's body from behind, indicating Mr. Mono was standing upright facing east toward the couch, not north toward Johnson as Montoya testified. Furthermore, Dr. Scott Luzi, the coroner who conducted the autopsy, determined that the cranial bullet wound associated with Montoya's gun would have made Mr. Mono collapse *immediately*, indicating that Mr. Mono was standing upright and facing the eastern wall when he fell to the floor from the bullet fired into his skull from behind by Montoya.

Contrarily, Johnson states he fired immediately upon seeing Mr. Mono facing east, reaching for the gun on the couch. But all of the bullets from Johnson's gun entered from the front downward, indicating that Mr. Mono's torso was "parallel to the floor," oriented north, not east toward the couch as Johnson testified. Furthermore, Johnson's testimony that he stood stationary as he fired his weapon with only his hand moving is incredible, as the pattern of holes created by his bullets clearly indicates that he was moving either east or west as he fired. Lastly, an eyewitness, Mr. Larry Berman, testified that seconds before the officers fired, Mr. Mono moved to the west, *away* from the purported location of the gun.

It is uncontested that a gun found at the scene was unloaded and holstered. Defendants have provided no explanation as to why the gun was found underneath the other side of the coffee table from Mr. Mono's body; nor have they explained why Frey kept his foot on it for ten minutes, long after Defendants completed their alleged protective sweep.

According to Plaintiff's Ballistics Expert, when Montoya delivered the crippling head shot, Mr. Mono had to have been standing to the west/northwest of the coffee table, away from the alleged location of the holstered, unloaded gun.

**Claim 3**: Plaintiff Estate has a claim for Discrimination on the basis of Disability under  Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq*.

<u>Elements Required to Establish Plaintiff's Claim No. 3:</u>

In order to prevail on its claim that Defendants discriminated against Paul Mono on the basis of a disability under the Americans with Disabilities Act, Plaintiff Estate must prove that:

1.    Paul Mono was an individual with a disability;

2.    Paul Mono was qualified to receive the benefit of the County of Orange's services, programs or activities;

3.    Paul Mono was either excluded from or denied the benefits of the County of Orange's services, programs or activities, or was otherwise discriminated against; and

4.    The exclusion, denial or benefits or discrimination was by reason of Paul Mono's disability.

With respect to the second element, "services, programs, or activities" includes arrests by police officers and their use of force.  With respect to the fourth element, discrimination includes a failure to reasonably accommodate a person's disability when the entity or its agents knew or should have known that the person was a qualifying individual with a disability.

(Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.; Sheehan v. City & Cty. of S.F.*, 743 F.3d 1211, 1232-33 (9th Cir. 2014), *reversed in part on other grounds*, 135 S. Ct. 1765 (2015).

**Key Evidence in Support of Claim 3:**

In 2016, Paul Mono and his wife Susan Peck obtained the services of real estate agent Jennifer Heflin to assist them in purchasing a residence in Laguna Woods Village, a private retirement community. Mr. Mono's eyesight was nearly gone due to retinitis pigmentosa, a degenerative disease that affects vision. They decided to relocate to Marina del Rey to an area that would be safer for Mr. Mono to navigate in light of his condition.

1  At the time of his death, Mr. Mono had just 10% of his eyesight left.  Mr. Mono also had

2  experienced escalating depression as a result of a cascade of difficult events that ensued

3  upon the couple's move to Laguna Woods Village, including a severe flu requiring

4  hospitalization, structural problems in their home caused by Dennis Metzler, a contractor

5  whom they had hired to retrofit the home in order to make it accessible for Mr. Mono in

6  light of his disability, and a recent assault of Mr. Mono at the hands of an electrician hired

7  by Metzler. Ms. Heflin had recommended Metzler to the couple.

8      On February 5, 2018, Ms. Heflin came to the residence to assess remaining remodel

9  issues. During this visit, the couple repeatedly told Ms. Heflin that they wanted to find

10 someone else to finish the work in light of Metzler's ballooning budget and failures. At

11 some point during this visit, Mr. Mono showed Ms. Heflin an unloaded revolver that he

12 owned. The bullets were kept separately in a plastic bag away from the gun, and at no point

13 did Ms. Heflin fear for her safety. She viewed Mr. Mono as a "good person" who would

14 "never hurt her."

15     In order to proceed with severing their agreement with Metzler to find a new

16 contractor, the couple needed floor plans that were in Metzler's possession. Ms. Heflin

17 contacted Metzler, who agreed to give her the floor plans the next day at a carport near the

18 home. She told Metzler that she did not think it was a good idea for him to interact with

19 Mr. Mono give how upset Mr. Mono was with him. On February 6, 2018, Ms. Heflin met

20 Metzler in the carport and got the floor plans. Metzler, who was upset that he had lost what

21 had become (for him) a more-lucrative-by-the-day deal with the couple, tried to dissuade

22 Heflin from entering the home and delivering the floor plans. To placate him, Ms. Heflin

23 told him that she would call him and keep her phone on while in the residence.

24     When Ms. Heflin was in the residence, Mr. Mono became upset because the plans

25 the couple was given were incorrect. Learning that Metzler was standing in the carport

26 nearby, Mr. Mono devolved into a mental health episode. Metzler called 911, stating he

27 could hear Mr. Mono threatening him over a phone held by Ms. Heflin, who was inside the

28 Mono-Peck home. Ms. Heflin, unaware that Metzler had called the police, left the

1   residence, hugged Mr. Mono and Ms. Peck goodbye, and told them she would see them the

2   next day. Ms. Heflin walked back to Metzler and learned he had called 911, which upset

3   her greatly, as she was not in any danger. Moments later, Defendants Frey, Montoya,

4   Johnson, Carrington, and Lind arrived, rushing past Ms. Heflin, who was now standing

5   with Metzler out in the open near a carport.

6        Ms. Heflin was the only witness to Mr. Mono's conduct, but Defendants ignored

7   her. Frey arrived first and, had he followed policy, would have spoken to Heflin whom he

8   knew had just been inside the Mono home, and taken the role of primary unit. He did

9   neither.  Neither Frey nor any other Defendant made any attempt to speak to Heflin at all

10  (nor did any other Defendant). If they had, she would have told them that Mr. Mono was

11  nearly blind and experiencing a mental health crisis, but was calm, non-threatening, and

12  not dangerous. Frey admits he spoke to Metzler for 30 seconds and then only to ask who

13  had placed the 911 call. Frey failed to inquire into Metzler's relationship with Mr. Mono,

14  and therefore remained ignorant that Metzler had not been inside the Mono-Peck home for

15  months, and had ill-will toward Mr. Mono because of a heated dispute over Metzler's

16  incomplete and shoddy repairs to the home. Frey failed to communicate to the other

17  Defendants what little he did learn from Metzler, other than having a "very brief"

18  conversation with Montoya in which he "probably" told him what Metzler had said.

19  Defendant Montoya stated that he didn't know whether Mr. Mono had been seen waving a

20  gun around that day, and he didn't have enough facts to determine probable cause.

21  Defendants' failure to obtain critical information from Metzler and Ms. Heflin contravened

22  state-mandated POST training and purported OCSD policy, and doomed Defendants'

23  tactical response from the start.

24        Defendants admit no discussion was had among them regarding any tactical plan.

25  Rather, Frey, Montoya, Johnson, Carrington, and Lind arrived and rushed up to the home.

26  They pressed directly up against the windows with weapons drawn. For the entirety of the

27  encounter save for the final few seconds, Defendants variously drew their guns and stood

28  inches away from the glass windows and door of the home, observing no gun, only a

1   frantic 64-year-old man with a red-tipped cane held above his head and at various times
2   flailing with it. The first arriving and senior officers (Frey and Carrington) failed to take
3   charge in violation of purported policy and training. Defendants admit Mr. Mono paced
4   about with his cane yelling "nonsense," random profanities, suicidal ideation, identifying
5   himself as blind and deaf, switching back and forth between English and Spanish, and
6   exposing his buttocks and genitals. Mr. Mono yelled repeatedly "just shoot me." Neighbor
7   Marsha Berman testified that Mr. Mono was acting "crazy" and "like a lunatic." Ms.
8   Berman also testified that Mr. Mono was wearing dark sunglasses and carrying a "blind
9   person's cane." To Defendants, this behavior and presentation suggested *only* that Mr.
10  Mono "had an issue with law enforcement authority", was "uncooperative;" it was not
11  indicative of any potential mental health issues or visual impairment.

12      Ms. Heflin had relevant, recent information concerning Mr. Mono's visual and
13  mental impairments. Their own observations would have substantiated this, including Mr.
14  Mono's (1) stating repeatedly he was blind, (2) use of a white, red-tipped cane which he
15  flailed about, and (3) wearing dark sunglasses indoors. These are clear indicators of visual
16  and mental impairment on which Defendants claim to be trained.

17      Further, there was no urgency.  Ms. Heflin and Mr. Metzler, against whom Mr.
18  Mono's threats had allegedly been made, stood outside near the home.  Neighbors Larry
19  and Marsha Berman and Shirley Heaton stood directly in front of the living room window
20  through which Johnson eventually fired his weapon, 100 feet away, and watched the entire
21  encounter. Indeed, at no time prior to the shooting did Frey feel that he, Mr. Metzler or the
22  neighbors were in danger. Ms. Heflin, who had seen Mr. Mono in his residence waving a
23  gun over his head for 30 seconds, was never fearful for her safety and would have told
24  Defendants so, had they bothered to speak to her. Lacking urgency, Defendants created the
25  situation, and then used their self-created escalation as justification for killing Mr. Mono.

26      Following a yelling match between Defendants and Mr. Mono, Frey radioed "He's
27  refusing to come out, he's refusing to let us in, we're at a stalemate." Rather than using this
28  time to retreat from their positions, discuss a tactical plan, wait for the Critical Incident

Response Team ("CIRT") that was already en route, call upon the Crisis Assessment Team ("CAT"), Crisis Negotiation Team, or SWAT team, Defendants remained where they were, pressed up against the windows, yelling at Mr. Mono. They failed to follow the orders of Sergeant McFatridge, who was not yet at the scene, to "set up a perimeter" and "confirm with informant." All of these decisions were contrary to policy.

Within seconds of allegedly noticing a holstered revolver on the couch located along the eastern wall of the apartment, Montoya and Johnson killed Mr. Mono, giving conflicting versions of Mr. Mono's final movements, neither of which conform with the physical evidence or eyewitness testimony. According to Plaintiff's ballistics expert David Balash, Defendants' investigation was "superficial at best." Defendants performed no analysis of the bullet trajectories, of the firing sequence, or of fingerprints on the holstered, unloaded gun recovered from the scene. Despite the glaring inadequacies of the investigation, Defendant County of Orange "exonerated" all Defendants. According to Plaintiff's Ballistics Expert (for whom Defendants have offered no rebuttal), the only possible explanations for the gravely flawed investigation are "investigative indifference" or "directions from command authorities on what will and will not be examined."

Moreover, physical evidence and eyewitness testimony directly contradict Defendants' testimony regarding Mr. Mono's movements during the final few seconds of the encounter. Montoya and Johnson allege they saw a gun on the couch along the east wall of the living room. Montoya states he started shooting when, after grabbing the gun, Mr. Mono turned north and lifted the gun to point it at Johnson. But all of the bullets from Montoya's gun entered Mr. Mono's body from behind, indicating Mr. Mono was standing upright facing east toward the couch, not north toward Johnson as Montoya testified. Furthermore, Dr. Scott Luzi, the coroner who conducted the autopsy, determined that the cranial bullet wound associated with Montoya's gun would have made Mr. Mono collapse *immediately*, indicating that Mr. Mono was standing upright and facing the eastern wall when he fell to the floor from the bullet fired into his skull from behind by Montoya. Contrarily, Johnson states he fired immediately upon seeing Mr. Mono facing east,

1   reaching for the gun on the couch. But all of the bullets from Johnson's gun entered from
2   the front downward, indicating that Mr. Mono's torso was "parallel to the floor," oriented
3   north, not east toward the couch as Johnson testified. Furthermore, Johnson's testimony
4   that he stood stationary as he fired his weapon with only his hand moving is incredible, as
5   the pattern of holes created by his bullets clearly indicates that he was moving either east or
6   west as he fired. Lastly, an eyewitness, Mr. Larry Berman, testified that seconds before the
7   officers fired, Mr. Mono moved to the west, *away* from the purported location of the gun.

8          It is uncontested that a gun found at the scene was unloaded and holstered.
9   Defendants have provided no explanation as to why the gun was found underneath the
10  other side of the coffee table from Mr. Mono's body; nor have they explained why Frey
11  kept his foot on it for ten minutes, long after Defendants completed their alleged protective
12  sweep.

13         According to Plaintiff's Ballistics Expert, when Montoya delivered the crippling
14  head shot, Mr. Mono had to have been standing to the west/northwest of the coffee table,
15  away from the alleged location of the holstered, unloaded gun.

16

17         **Claim 4**: Plaintiff Estate has a claim for Discrimination on the basis of Disability
18             under Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 791, *et seq*.

19

20         Elements Required to Establish Plaintiff's Claim No. 4:

21         In order to prevail on its claim that Defendants discriminated against Paul Mono
22  on the basis of a disability under Section 504 of the Rehabilitation Act, Plaintiff Estate
23  must prove the same elements of its fourth claim and, in addition, that the program from
24  which Paul Mono was denied a benefit receives federal financial assistance.  Because
25  there is no dispute that Defendant County of Orange's Sheriff's Department receives
26  federal financial assistance, if Plaintiff Estate proves its third claim, it proves its fourth
27  claim.

28

1  (Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 791, *et seq.*; *Bassilios v. City of*

2  *Torrance*, 166 F. Supp. 3d 1061, 1069 (C.D. Cal. 2015).

3

4  **Key Evidence in Support of Claim 4:**

5         In 2016, Paul Mono and his wife Susan Peck obtained the services of real estate

6  agent Jennifer Heflin to assist them in purchasing a residence in Laguna Woods Village, a

7  private retirement community. Mr. Mono's eyesight was nearly gone due to retinitis

8  pigmentosa, a degenerative disease that affects vision. They decided to relocate to Marina

9  del Rey to an area that would be safer for Mr. Mono to navigate in light of his condition.

10  At the time of his death, Mr. Mono had just 10% of his eyesight left.  Mr. Mono also had

11  experienced escalating depression as a result of a cascade of difficult events that ensued

12  upon the couple's move to Laguna Woods Village, including a severe flu requiring

13  hospitalization, structural problems in their home caused by Dennis Metzler, a contractor

14  whom they had hired to retrofit the home in order to make it accessible for Mr. Mono in

15  light of his disability, and a recent assault of Mr. Mono at the hands of an electrician hired

16  by Metzler. Ms. Heflin had recommended Metzler to the couple.

17         On February 5, 2018, Ms. Heflin came to the residence to assess remaining remodel

18  issues. During this visit, the couple repeatedly told Ms. Heflin that they wanted to find

19  someone else to finish the work in light of Metzler's ballooning budget and failures. At

20  some point during this visit, Mr. Mono showed Ms. Heflin an unloaded revolver that he

21  owned. The bullets were kept separately in a plastic bag away from the gun, and at no point

22  did Ms. Heflin fear for her safety. She viewed Mr. Mono as a "good person" who would

23  "never hurt her."

24         In order to proceed with severing their agreement with Metzler to find a new

25  contractor, the couple needed floor plans that were in Metzler's possession. Ms. Heflin

26  contacted Metzler, who agreed to give her the floor plans the next day at a carport near the

27  home. She told Metzler that she did not think it was a good idea for him to interact with

28  Mr. Mono give how upset Mr. Mono was with him. On February 6, 2018, Ms. Heflin met

PLTF'S AMENDED MEMORANDUM OF
CONTENTIONS OF FACT & LAW                    -23-

1  Metzler in the carport and got the floor plans. Metzler, who was upset that he had lost what

2  had become (for him) a more-lucrative-by-the-day deal with the couple, tried to dissuade

3  Heflin from entering the home and delivering the floor plans. To placate him, Ms. Heflin

4  told him that she would call him and keep her phone on while in the residence.

5         When Ms. Heflin was in the residence, Mr. Mono became upset because the plans

6  the couple was given were incorrect. Learning that Metzler was standing in the carport

7  nearby, Mr. Mono devolved into a mental health episode. Metzler called 911, stating he

8  could hear Mr. Mono threatening him over a phone held by Ms. Heflin, who was inside the

9  Mono-Peck home. Ms. Heflin, unaware that Metzler had called the police, left the

10  residence, hugged Mr. Mono and Ms. Peck goodbye, and told them she would see them the

11  next day. Ms. Heflin walked back to Metzler and learned he had called 911, which upset

12  her greatly, as she was not in any danger. Moments later, Defendants Frey, Montoya,

13  Johnson, Carrington, and Lind arrived, rushing past Ms. Heflin, who was now standing

14  with Metzler out in the open near a carport.

15          Ms. Heflin was the only witness to Mr. Mono's conduct, but Defendants ignored

16  her. Frey arrived first and, had he followed policy, would have spoken to Heflin whom he

17  knew had just been inside the Mono home, and taken the role of primary unit. He did

18  neither.  Neither Frey nor any other Defendant made any attempt to speak to Heflin at all

19  (nor did any other Defendant). If they had, she would have told them that Mr. Mono was

20  nearly blind and experiencing a mental health crisis, but was calm, non-threatening, and

21  not dangerous. Frey admits he spoke to Metzler for 30 seconds and then only to ask who

22  had placed the 911 call. Frey failed to inquire into Metzler's relationship with Mr. Mono,

23  and therefore remained ignorant that Metzler had not been inside the Mono-Peck home for

24  months, and had ill-will toward Mr. Mono because of a heated dispute over Metzler's

25  incomplete and shoddy repairs to the home. Frey failed to communicate to the other

26  Defendants what little he did learn from Metzler, other than having a "very brief"

27  conversation with Montoya in which he "probably" told him what Metzler had said.

28  Defendant Montoya stated that he didn't know whether Mr. Mono had been seen waving a

1  gun around that day, and he didn't have enough facts to determine probable cause.

2  Defendants' failure to obtain critical information from Metzler and Ms. Heflin contravened

3  state-mandated POST training and purported OCSD policy, and doomed Defendants'

4  tactical response from the start.

5       Defendants admit no discussion was had among them regarding any tactical plan.

6  Rather, Frey, Montoya, Johnson, Carrington, and Lind arrived and rushed up to the home.

7  They pressed directly up against the windows with weapons drawn. For the entirety of the

8  encounter save for the final few seconds, Defendants variously drew their guns and stood

9  inches away from the glass windows and door of the home, observing no gun, only a

10  frantic 64-year-old man with a red-tipped cane held above his head and at various times

11  flailing with it. The first arriving and senior officers (Frey and Carrington) failed to take

12  charge in violation of purported policy and training. Defendants admit Mr. Mono paced

13  about with his cane yelling "nonsense," random profanities, suicidal ideation, identifying

14  himself as blind and deaf, switching back and forth between English and Spanish, and

15  exposing his buttocks and genitals. Mr. Mono yelled repeatedly "just shoot me." Neighbor

16  Marsha Berman testified that Mr. Mono was acting "crazy" and "like a lunatic." Ms.

17  Berman also testified that Mr. Mono was wearing dark sunglasses and carrying a "blind

18  person's cane." To Defendants, this behavior and presentation suggested *only* that Mr.

19  Mono "had an issue with law enforcement authority", was "uncooperative;" it was not

20  indicative of any potential mental health issues or visual impairment.

21       Ms. Heflin had relevant, recent information concerning Mr. Mono's visual and

22  mental impairments. Their own observations would have substantiated this, including Mr.

23  Mono's (1) stating repeatedly he was blind, (2) use of a white, red-tipped cane which he

24  flailed about, and (3) wearing dark sunglasses indoors. These are clear indicators of visual

25  and mental impairment on which Defendants claim to be trained.

26       Further, there was no urgency.  Ms. Heflin and Mr. Metzler, against whom Mr.

27  Mono's threats had allegedly been made, stood outside near the home.  Neighbors Larry

28  and Marsha Berman and Shirley Heaton stood directly in front of the living room window

through which Johnson eventually fired his weapon, 100 feet away, and watched the entire encounter. Indeed, at no time prior to the shooting did Frey feel that he, Mr. Metzler or the neighbors were in danger. Ms. Heflin, who had seen Mr. Mono in his residence waving a gun over his head for 30 seconds, was never fearful for her safety and would have told Defendants so, had they bothered to speak to her. Lacking urgency, Defendants created the situation, and then used their self-created escalation as justification for killing Mr. Mono.

Following a yelling match between Defendants and Mr. Mono, Frey radioed "He's refusing to come out, he's refusing to let us in, we're at a stalemate." Rather than using this time to retreat from their positions, discuss a tactical plan, wait for the Critical Incident Response Team ("CIRT") that was already en route, call upon the Crisis Assessment Team ("CAT"), Crisis Negotiation Team, or SWAT team, Defendants remained where they were, pressed up against the windows, yelling at Mr. Mono. They failed to follow the orders of Sergeant McFatridge, who was not yet at the scene, to "set up a perimeter" and "confirm with informant." All of these decisions were contrary to policy.

Within seconds of allegedly noticing a holstered revolver on the couch located along the eastern wall of the apartment, Montoya and Johnson killed Mr. Mono, giving conflicting versions of Mr. Mono's final movements, neither of which conform with the physical evidence or eyewitness testimony. According to Plaintiff's ballistics expert David Balash, Defendants' investigation was "superficial at best." Defendants performed no analysis of the bullet trajectories, of the firing sequence, or of fingerprints on the holstered, unloaded gun recovered from the scene. Despite the glaring inadequacies of the investigation, Defendant County of Orange "exonerated" all Defendants. According to Plaintiff's Ballistics Expert (for whom Defendants have offered no rebuttal), the only possible explanations for the gravely flawed investigation are "investigative indifference" or "directions from command authorities on what will and will not be examined."

Moreover, physical evidence and eyewitness testimony directly contradict Defendants' testimony regarding Mr. Mono's movements during the final few seconds of the encounter. Montoya and Johnson allege they saw a gun on the couch along the east

wall of the living room. Montoya states he started shooting when, after grabbing the gun, Mr. Mono turned north and lifted the gun to point it at Johnson. But all of the bullets from Montoya's gun entered Mr. Mono's body from behind, indicating Mr. Mono was standing upright facing east toward the couch, not north toward Johnson as Montoya testified. Furthermore, Dr. Scott Luzi, the coroner who conducted the autopsy, determined that the cranial bullet wound associated with Montoya's gun would have made Mr. Mono collapse *immediately*, indicating that Mr. Mono was standing upright and facing the eastern wall when he fell to the floor from the bullet fired into his skull from behind by Montoya.

Contrarily, Johnson states he fired immediately upon seeing Mr. Mono facing east, reaching for the gun on the couch. But all of the bullets from Johnson's gun entered from the front downward, indicating that Mr. Mono's torso was "parallel to the floor," oriented north, not east toward the couch as Johnson testified. Furthermore, Johnson's testimony that he stood stationary as he fired his weapon with only his hand moving is incredible, as the pattern of holes created by his bullets clearly indicates that he was moving either east or west as he fired. Lastly, an eyewitness, Mr. Larry Berman, testified that seconds before the officers fired, Mr. Mono moved to the west, *away* from the purported location of the gun.

It is uncontested that a gun found at the scene was unloaded and holstered. Defendants have provided no explanation as to why the gun was found underneath the other side of the coffee table from Mr. Mono's body; nor have they explained why Frey kept his foot on it for ten minutes, long after Defendants completed their alleged protective sweep.

According to Plaintiff's Ballistics Expert, when Montoya delivered the crippling head shot, Mr. Mono had to have been standing to the west/northwest of the coffee table, away from the alleged location of the holstered, unloaded gun.

**Claim 5**: Plaintiff Susan Peck has a claim for Wrongful Death under California law.

<u>Elements Required to Establish Plaintiff's Claim No. 5:</u>

1.    Defendants were negligent, including but not limited to in their tactical conduct and decisions preceding their use of deadly force against Paul Mono;

2.    Paul Mono was harmed;

3.    Defendants' negligence was a substantial factor in causing Paul Mono's harm.

(Judicial Council of California Civil Jury Instructions ("CACI") § 400, *et seq.* "[N]egligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment." *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016). "Under California law, negligence liability 'can arise if the tactical conduct and decisions leading up to the use of deadly force [by law enforcement] show, as part of the totality of circumstances, that the use of deadly force was unreasonable.'" *Id.* (quoting *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 626 (2013). "[P]reshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable, such as where officers negligently provoke a dangerous situation in which the subsequent use of deadly force was justified." *Dorger v. City of Napa*, No. 12-cv-00440-WHO, 2013 U.S. Dist. LEXIS 153696, at *30 (N.D. Cal. Oct. 24, 2013) (citing *Hayes*, 57 Cal. 4th at 630); *see also Howard v. Cnty. of Riverside*, No. EDCV1200700 VAPOPX, 2014 U.S. Dist. LEXIS 196517 (C.D. Cal. May 7, 2014). *See also Munoz v. Olin*, 24 Cal.3d 629, 634 (1979) (California Supreme Court held that police officers have a duty to act reasonably when using deadly force and that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect."); *Grudt v. City of Los Angeles*, 2 Cal. 3d 575, 587, (1970)).

**Key Evidence in Support of Claim 5:**

In 2016, Paul Mono and his wife Susan Peck obtained the services of real estate

1  agent Jennifer Heflin to assist them in purchasing a residence in Laguna Woods Village, a
2  private retirement community. Mr. Mono's eyesight was nearly gone due to retinitis
3  pigmentosa, a degenerative disease that affects vision. They decided to relocate to Marina
4  del Rey to an area that would be safer for Mr. Mono to navigate in light of his condition.
5  At the time of his death, Mr. Mono had just 10% of his eyesight left.  Mr. Mono also had
6  experienced escalating depression as a result of a cascade of difficult events that ensued
7  upon the couple's move to Laguna Woods Village, including a severe flu requiring
8  hospitalization, structural problems in their home caused by Dennis Metzler, a contractor
9  whom they had hired to retrofit the home in order to make it accessible for Mr. Mono in
10 light of his disability, and a recent assault of Mr. Mono at the hands of an electrician hired
11 by Metzler. Ms. Heflin had recommended Metzler to the couple.

12        On February 5, 2018, Ms. Heflin came to the residence to assess remaining remodel
13 issues. During this visit, the couple repeatedly told Ms. Heflin that they wanted to find
14 someone else to finish the work in light of Metzler's ballooning budget and failures. At
15 some point during this visit, Mr. Mono showed Ms. Heflin an unloaded revolver that he
16 owned. The bullets were kept separately in a plastic bag away from the gun, and at no point
17 did Ms. Heflin fear for her safety. She viewed Mr. Mono as a "good person" who would
18 "never hurt her."

19        In order to proceed with severing their agreement with Metzler to find a new
20 contractor, the couple needed floor plans that were in Metzler's possession. Ms. Heflin
21 contacted Metzler, who agreed to give her the floor plans the next day at a carport near the
22 home. She told Metzler that she did not think it was a good idea for him to interact with
23 Mr. Mono give how upset Mr. Mono was with him. On February 6, 2018, Ms. Heflin met
24 Metzler in the carport and got the floor plans. Metzler, who was upset that he had lost what
25 had become (for him) a more-lucrative-by-the-day deal with the couple, tried to dissuade
26 Heflin from entering the home and delivering the floor plans. To placate him, Ms. Heflin
27 told him that she would call him and keep her phone on while in the residence.
28        When Ms. Heflin was in the residence, Mr. Mono became upset because the plans

PLTF'S AMENDED MEMORANDUM OF        -29-
CONTENTIONS OF FACT & LAW

1    the couple was given were incorrect. Learning that Metzler was standing in the carport

2    nearby, Mr. Mono devolved into a mental health episode. Metzler called 911, stating he

3    could hear Mr. Mono threatening him over a phone held by Ms. Heflin, who was inside the

4    Mono-Peck home. Ms. Heflin, unaware that Metzler had called the police, left the

5    residence, hugged Mr. Mono and Ms. Peck goodbye, and told them she would see them the

6    next day. Ms. Heflin walked back to Metzler and learned he had called 911, which upset

7    her greatly, as she was not in any danger. Moments later, Defendants Frey, Montoya,

8    Johnson, Carrington, and Lind arrived, rushing past Ms. Heflin, who was now standing

9    with Metzler out in the open near a carport.

10           Ms. Heflin was the only witness to Mr. Mono's conduct, but Defendants ignored

11    her. Frey arrived first and, had he followed policy, would have spoken to Heflin whom he

12    knew had just been inside the Mono home, and taken the role of primary unit. He did

13    neither.  Neither Frey nor any other Defendant made any attempt to speak to Heflin at all

14    (nor did any other Defendant). If they had, she would have told them that Mr. Mono was

15    nearly blind and experiencing a mental health crisis, but was calm, non-threatening, and

16    not dangerous. Frey admits he spoke to Metzler for 30 seconds and then only to ask who

17    had placed the 911 call. Frey failed to inquire into Metzler's relationship with Mr. Mono,

18    and therefore remained ignorant that Metzler had not been inside the Mono-Peck home for

19    months, and had ill-will toward Mr. Mono because of a heated dispute over Metzler's

20    incomplete and shoddy repairs to the home. Frey failed to communicate to the other

21    Defendants what little he did learn from Metzler, other than having a "very brief"

22    conversation with Montoya in which he "probably" told him what Metzler had said.

23    Defendant Montoya stated that he didn't know whether Mr. Mono had been seen waving a

24    gun around that day, and he didn't have enough facts to determine probable cause.

25    Defendants' failure to obtain critical information from Metzler and Ms. Heflin contravened

26    state-mandated POST training and purported OCSD policy, and doomed Defendants'

27    tactical response from the start.

28           Defendants admit no discussion was had among them regarding any tactical plan.

1  Rather, Frey, Montoya, Johnson, Carrington, and Lind arrived and rushed up to the home.

2  They pressed directly up against the windows with weapons drawn. For the entirety of the

3  encounter save for the final few seconds, Defendants variously drew their guns and stood

4  inches away from the glass windows and door of the home, observing no gun, only a

5  frantic 64-year-old man with a red-tipped cane held above his head and at various times

6  flailing with it. The first arriving and senior officers (Frey and Carrington) failed to take

7  charge in violation of purported policy and training. Defendants admit Mr. Mono paced

8  about with his cane yelling "nonsense," random profanities, suicidal ideation, identifying

9  himself as blind and deaf, switching back and forth between English and Spanish, and

10 exposing his buttocks and genitals. Mr. Mono yelled repeatedly "just shoot me." Neighbor

11 Marsha Berman testified that Mr. Mono was acting "crazy" and "like a lunatic." Ms.

12 Berman also testified that Mr. Mono was wearing dark sunglasses and carrying a "blind

13 person's cane." To Defendants, this behavior and presentation suggested *only* that Mr.

14 Mono "had an issue with law enforcement authority", was "uncooperative;" it was not

15 indicative of any potential mental health issues or visual impairment.

16      Ms. Heflin had relevant, recent information concerning Mr. Mono's visual and

17 mental impairments. Their own observations would have substantiated this, including Mr.

18 Mono's (1) stating repeatedly he was blind, (2) use of a white, red-tipped cane which he

19 flailed about, and (3) wearing dark sunglasses indoors. These are clear indicators of visual

20 and mental impairment on which Defendants claim to be trained.

21      Further, there was no urgency.  Ms. Heflin and Mr. Metzler, against whom Mr.

22 Mono's threats had allegedly been made, stood outside near the home.  Neighbors Larry

23 and Marsha Berman and Shirley Heaton stood directly in front of the living room window

24 through which Johnson eventually fired his weapon, 100 feet away, and watched the entire

25 encounter. Indeed, at no time prior to the shooting did Frey feel that he, Mr. Metzler or the

26 neighbors were in danger. Ms. Heflin, who had seen Mr. Mono in his residence waving a

27 gun over his head for 30 seconds, was never fearful for her safety and would have told

28 Defendants so, had they bothered to speak to her. Lacking urgency, Defendants created the

1   situation, and then used their self-created escalation as justification for killing Mr. Mono.

2       Following a yelling match between Defendants and Mr. Mono, Frey radioed "He's

3   refusing to come out, he's refusing to let us in, we're at a stalemate." Rather than using this

4   time to retreat from their positions, discuss a tactical plan, wait for the Critical Incident

5   Response Team ("CIRT") that was already en route, call upon the Crisis Assessment Team

6   ("CAT"), Crisis Negotiation Team, or SWAT team, Defendants remained where they

7   were, pressed up against the windows, yelling at Mr. Mono. They failed to follow the

8   orders of Sergeant McFatridge, who was not yet at the scene, to "set up a perimeter" and

9   "confirm with informant." All of these decisions were contrary to policy.

10      Within seconds of allegedly noticing a holstered revolver on the couch located along

11  the eastern wall of the apartment, Montoya and Johnson killed Mr. Mono, giving

12  conflicting versions of Mr. Mono's final movements, neither of which conform with the

13  physical evidence or eyewitness testimony. According to Plaintiff's ballistics expert David

14  Balash, Defendants' investigation was "superficial at best." Defendants performed no

15  analysis of the bullet trajectories, of the firing sequence, or of fingerprints on the holstered,

16  unloaded gun recovered from the scene. Despite the glaring inadequacies of the

17  investigation, Defendant County of Orange "exonerated" all Defendants. According to

18  Plaintiff's Ballistics Expert (for whom Defendants have offered no rebuttal), the only

19  possible explanations for the gravely flawed investigation are "investigative indifference"

20  or "directions from command authorities on what will and will not be examined."

21      Moreover, physical evidence and eyewitness testimony directly contradict

22  Defendants' testimony regarding Mr. Mono's movements during the final few seconds of

23  the encounter. Montoya and Johnson allege they saw a gun on the couch along the east

24  wall of the living room. Montoya states he started shooting when, after grabbing the gun,

25  Mr. Mono turned north and lifted the gun to point it at Johnson. But all of the bullets from

26  Montoya's gun entered Mr. Mono's body from behind, indicating Mr. Mono was standing

27  upright facing east toward the couch, not north toward Johnson as Montoya testified.

28  Furthermore, Dr. Scott Luzi, the coroner who conducted the autopsy, determined that the

cranial bullet wound associated with Montoya's gun would have made Mr. Mono collapse *immediately*, indicating that Mr. Mono was standing upright and facing the eastern wall when he fell to the floor from the bullet fired into his skull from behind by Montoya.

Contrarily, Johnson states he fired immediately upon seeing Mr. Mono facing east, reaching for the gun on the couch. But all of the bullets from Johnson's gun entered from the front downward, indicating that Mr. Mono's torso was "parallel to the floor," oriented north, not east toward the couch as Johnson testified. Furthermore, Johnson's testimony that he stood stationary as he fired his weapon with only his hand moving is incredible, as the pattern of holes created by his bullets clearly indicates that he was moving either east or west as he fired. Lastly, an eyewitness, Mr. Larry Berman, testified that seconds before the officers fired, Mr. Mono moved to the west, *away* from the purported location of the gun.

It is uncontested that a gun found at the scene was unloaded and holstered. Defendants have provided no explanation as to why the gun was found underneath the other side of the coffee table from Mr. Mono's body; nor have they explained why Frey kept his foot on it for ten minutes, long after Defendants completed their alleged protective sweep.

According to Plaintiff's Ballistics Expert, when Montoya delivered the crippling head shot, Mr. Mono had to have been standing to the west/northwest of the coffee table, away from the alleged location of the holstered, unloaded gun.

## 2.    Evidentiary Issues and Issues of Law

Plaintiffs filed four motions *in limine* (Dkts. 126, 127, 128, and 129) on March 2, 2021. These motions *in limine* seek to exclude argument, evidence and testimony regarding irrelevant aspects of Ms. Peck and Mr. Mono's personal life, as well as argument, evidence and testimony regarding Ms. Peck's state tort claim and Mr. Mono's daughters. Additionally, filed herewith is a fifth motion to exclude certain testimony and opinions of Defendants' "Police Practices Expert" Robert Fonzi. The Parties have been working together on and will soon file a Second Amended Exhibit List.

**3.    Bifurcation of Issues (L.R. 16-4.3)**

Plaintiffs respectfully request that the Court order this case bifurcated into liability and punitive damages phases.  The first part of the trial would address liability for all of the claims addressed herein and whether there will be an award of damages.  The second phase would proceed only if the jury finds liability, and would decide what the punitive damages awards will be.  This will allow for a more efficient trial and conserve judicial resources, if there is no liability there will be no punitive damages phase, while at the same time ensuring that potentially prejudicial evidence regarding both Plaintiffs and Defendants that may be admissible in connection with punitive damages does not play a role in the assessment of liability.

**4.    Jury Trial (L.R. 16-4.4)**

Plaintiffs' claims are triable to a jury and Plaintiffs have made a timely demand for a trial by jury.

**5.    Attorneys' Fees (L.R. 16-4.5)**

Plaintiffs' attorneys' fees are recoverable in connection with a number of her claims, including those under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131 *et seq.*); and Section 504 of the Rehabilitation Act (29 U.S.C. §§ 791 *et seq.*). Plaintiffs will seek attorneys' fees if they prevail under any of the claims where such fees are recoverable.

/ / /

/ / /

/ / /

**6.     Abandonment of Issues (L.R. 16-4.6)**

   Plaintiffs do not abandon any claims.


Dated: April 3, 2023      Respectfully Submitted,

            HADSELL STORMER RENICK & DAI LLP


            By:  /s/ - David Clay Washington
               Barbara Enloe Hadsell
               Dan Stormer
               David Clay Washington
            Attorneys for Plaintiffs